Robert BOYKIN, et al., Plaintiffs-Appellants Cross-Appellees,

v.

GEORGIA–PACIFIC CORPORATION, Defendant-Appellee Cross-Appellant.

No. 81–4521.

United States Court of Appeals, Fifth Circuit.

June 16, 1983.

Rehearing and Rehearing En Banc Denied Aug. 15, 1983.

Danny E. Cupit, Jackson, Miss., James E. Youngdahl, Little Rock, Ark., Richard B. Sobol, Washington, D.C., for plaintiffs-appellants cross-appellees.

Peyton S. Irby, Jr., L. Arnold Pyle, William A. Pyle, Jackson, Miss., for defendant-appellee cross-appellants.

Before GARZA, POLITZ and JOHNSON, Circuit Judges.

GARZA, Circuit Judge:

The only thing more shocking than the racial discrimination practiced by defendant Georgia-Pacific Corporation is the unconscionable delay by the magistrate of more than five years in rendering a decision in this action. It is all too obvious that but for the plaintiffs' filing of a motion directing the magistrate to issue a decision within forty-five days, we would not yet have this case before us. Five days prior to a hearing on said motion, the magistrate finally issued his recommendation, which was adverse to plaintiffs in all respects. That opinion was adopted by the district court. For the reasons stated herein, we reverse that opinion and remand the case to the district court where it hopefully will receive more expeditious treatment than it has heretofore.

### FACTS

This class action was brought under Title VII, 42 U.S.C. § 2000e et seq. and 42 U.S.C. § 1981 to challenge alleged racial discrimination in the initial assignment and promotion of blacks at the Georgia-Pacific chip-n-saw mill in rural Goss, Mississippi.[1] A chip-n-saw mill is a modern facility designed to produce finished lumber from raw timber. This plant opened in 1970 and, depending on whether it operated on one or two shifts a day, employed either between sixty to seventy persons or 100 to 110 persons.

The EEOC charge in this case was filed in July of 1972 by the International Woodworkers of America (IWA). A right to sue

letter was issued to the IWA in July of the following year and the complaint was filed shortly thereafter. At the time the lawsuit was filed, the IWA was certified by the National Labor Relations Board as the exclusive bargaining agent for the plant employees. The individual plaintiffs did not file EEOC charges, but instead relied on that filed by the union.

The EEOC charge was filed by the union during the pendency of a strike called to protest the inability of the union to secure a collective bargaining agreement with the defendant. The union was never successful in this regard. In 1974, it withdrew its representational status but has not ceased, in the magistrate's words, "to vigorously pursue this particular lawsuit." Record on Appeal, vol. 5 at 656.

The named plaintiffs in this action are two black men who were employed at the chip-n-saw mill until mid-1972. It is clear that defendant was willing to hire blacks at its plant; although the area labor force was approximately thirty percent black, often fifty percent of the plant's work force was black. What is at issue, however, is the quality of the jobs which these individuals were allowed to fill. The chip-n-saw mill is organized into five departments—Log Yard Department, Sawmill Department, Rough Lumber Manufacturing Department, Planer Mill Department and Shipping Department. Within each department, there are various job classifications. The bottom rung of the employment ladder is a classification called "utility," which is where most blacks, including the named plaintiffs, both began and ended their employment.

Plaintiff Robert Boykin was assigned to utility despite the fact that he had a great deal of relevant prior experience. He had previously worked in a plant that manufactured wood products and had received vocational training as a diesel mechanic. After his initial assignment, he repeatedly requested promotions from his supervisor, but his appeals were to no avail. In January of

---

1. The original complaint included a claim of discriminatory hiring practices which has not been pursued in this appeal.

1972, a white employee who had just completed probation was given the position (forklift operator) that Boykin had been seeking. Plaintiff Thomas Powell also completed his two years of work at the plant as a utility. He had fifteen years of prior experience at a furniture plant but was still unable to secure a promotion.

The initial assignment of new employees at the plant was made by the plant manager or plant superintendent. Promotion decisions, on the other hand, were delegated to the foreman of the department that experienced a vacancy, but the plant superintendent retained veto power over the foreman's choice. The management did not post notices of vacancies within departments. Neither did it have any written procedures regarding the filling of vacancies until long after this action was filed. Plaintiffs contend that racial discrimination prevented blacks from initially receiving or indeed ever receiving the good jobs at the plant.

In order to prove their contentions, plaintiffs presented a battery of statistical evidence designed to show racial discrimination from the disparities between percentages of blacks and whites who received favorable initial assignments and promotions. In addition, plaintiffs bolstered their statistical case by presenting evidence concerning individual employment decisions, both (1) evidence from black witnesses about their inability to secure preferable assignments, and (2) evidence of the preferences shown to white employees, notably preferences given to whites who were family or friends of the upper level plant personnel.

## CLASS CERTIFICATION

The first prong of plaintiffs' attack upon the lower court judgment is aimed at the denial of class certification. The action was tentatively certified as a class action in 1974, with a final decision reserved until after trial. When the magistrate finally issued his recommendations in 1981, he denied class certification for two reasons. First, he held that the number of persons involved was not great enough to meet the numerosity requirement of Fed.Rule Civ. Pro. 23(a).[2] Second, he held that the claims of the individual plaintiffs were stale since they had not been involved with the Georgia-Pacific plant since 1972.

In order to determine whether the numerosity requirement was indeed met, we must examine the exact boundaries of the class. At the time of tentative class certification, the class was identified as all past, present and prospective black employees and all unsuccessful applicants for employment at the sawmill. Since the hiring claim has not been pursued upon appeal, that portion of the class must be eliminated. The claims of present and past black employees are raised in this appeal. Therefore, a class of 317 individuals remains. Certainly, a class of this magnitude is large enough to meet the numerosity requirement.

Defendant claims that the class includes fewer than twenty individuals. This number was calculated by determining the number of promotions which could have occurred during the relevant period (69) and then assuming that blacks were hired at a rate equal to their participation in the labor force (approximately 30%). The total number of jobs at issue is only approximately twenty, a number much too small to meet the numerosity requirement. However, this argument ignores the fact that the contours of this class encompass all present and past black employees. This is a case where employees were *not* promoted. All 317 individuals have a stake in that claim.

**2.** Federal Rule of Civil Procedure 23(a) provides:

Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

There is no way to limit the action to twenty persons, as defendant suggests, because it is impossible to identify those persons who would have been hired but for the discrimination which occurred.

■ The magistrate also denied class certification because, in his words, "none of the individual plaintiffs have had any contact with the defendant plant since August of 1972." Record on Appeal, vol. 5 at 679. The relevant consideration for purposes of Rule 23, however, is not length of absence from the plant but willingness and ability to litigate the issues on behalf of the class. The plaintiffs shall not be penalized for the five year delay of the magistrate in deciding this case which makes the time span between employment and final resolution so large.

The magistrate's recommendation also refers to *East Texas Motor Freight v. Rodriguez,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), as support for its holding that the individual plaintiffs are not proper class representatives. Reliance upon that case is misplaced. In *Rodriguez,* the plaintiffs were judged improper class representatives because there were objective qualifications standards that they did not meet. Since prior qualifications are irrelevant in this case, the two cases are not analogous.

## VALIDITY OF THE STATISTICAL EVIDENCE

The validity of statistical proof as a means of proving a prima facie Title VII case has long met with acceptance in the courts. *E.g., Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Johnson v. Uncle Ben's, Inc.,* 628 F.2d 419 (1980), *vacated on other grounds,* 451 U.S. 902, 101 S.Ct. 1967, 68 L.Ed.2d 290 (1981); *Fisher v. Procter & Gamble Mfg. Co.,* 613 F.2d 527 (5th Cir.1980), *cert. denied,* 449 U.S. 1115, 101 S.Ct. 929, 66 L.Ed.2d 845 (1981); *Parson v. Kaiser Aluminum & Chemical Corp.,* 575 F.2d 1374 (5th Cir.1978), *cert. denied,* 441 U.S. 968, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979).

This class action was brought to remedy "pervasive resistance to the principles of equality of treatment and opportunity in the workplace articulated in Title VII." *Rivera v. City of Wichita Falls,* 665 F.2d 531, 534 (5th Cir.1982). The battery of statistical evidence which was presented does show that a significantly smaller percentage of blacks are initially assigned to a classification other than utility. Likewise, a much smaller percentage of blacks are ever promoted to higher positions and those who are promoted must wait much longer for this opportunity than their white counterparts.

The following is a summary of the statistical evidence presented by plaintiffs at the trial of this case:

### Table I

Number and Percentage by Race of Employees Whose
Initial Assignment Was Not to the Utility Position

| Race | Total Number Employed | Number Not Initially Assigned to Utility | Percentage Not Assigned to Utility |
|---|---|---|---|
| White | 444 | 90 | 20.3% |
| Black | 317 | 22 | 6.9% |

## Table II

Number and Percentage by Race of Employees
Who Had Relevant Prior Experience and Whose
Initial Assignment Was Not to the Utility Position

| Race | Number with Relevant Prior Experience | Number Not Initially Assigned to Utility Position | Percentage Initially Not Assigned to Utility |
|------|------|------|------|
| White | 184 | 61 | 33.2% |
| Black | 107 | 13 | 12.1% |

## Table III

### All-White Job Classifications

| Job Classification | Number of Whites Assigned |
|------|------|
| Saw Filer | 4 |
| Saw Filer Helper | 6 |
| Lead Electrician | 1 |
| Electrician | 7 |
| Electrician Helper | 5 |
| Millwright Carpenter | 2 |
| Millwright/kiln Operator | 2 |
| Kiln Operator | 4 |
| Kiln Operator Trainee | 4 |
| Crane Operator | 3 |
| Chip-n-saw Operator/Millwright | 2 |
| Chip-n-saw Operator | 11 |
| Chip-n-saw Trainee | 3 |
| Shipping Clerk | 4 |
| Machine Operator | 5 |
| Stacker Operator | 6 |
| Diesel Mechanic | 6 |
| Diesel Mechanic Helper | 1 |
| Total: | 78 |

## Table IV

Average Wage of Employees in the Work Force on
2/11/76 by Race by Year of Hire

| Year of Hire | Whites | | Blacks | | Difference: White Wage- Black Wage |
|------|------|------|------|------|------|
| | Number | Average Wage | Number | Average Wage | |
| 1970 | 5 | $3.88 | 6 | $2.99 | $0.89 |
| 1971 | 3 | 3.90 | 2 | 2.82 | 1.08 |
| 1972 | 5 | 3.11 | 3 | 2.75 | 0.36 |
| 1973 | 4 | 3.55 | 3 | 2.91 | 0.64 |
| 1974 | 2 | 3.43 | 2 | 2.78 | 0.65 |
| 1975 | 10 | 3.59 | 11 | 2.77 | 0.82 |
| 1976 | 2 | 2.65 | 7 | 2.65 | 0.00 |

### Table V

Average Wage of Employees in Work Force
on 2/11/76 by Race, by Experience

| Experience | Whites | | Blacks | | Difference:<br>White Wage-<br>Black Wage |
|---|---|---|---|---|---|
| | Number | Average<br>Wage | Number | Average<br>Wage | |
| With prior<br>experience | 16 | $3.77 | 17 | $2.86 | $0.91 |
| With no<br>prior exp. | 16 | 3.21 | 16 | 2.73 | 0.48 |

### Table VI

Number and Percentage by Race of Non-probationary
Employees Whose Initial Assignment Was In the
Utility Position and Who Were Promoted Above Utility

| Race | Number of non-<br>probationary employees<br>whose initial assignment<br>was in Utility | Number who<br>were promoted<br>out of Utility | Percentage<br>who were promoted<br>out of<br>Utility |
|---|---|---|---|
| White | 178 | 84 | 47.2% |
| Black | 157 | 42 | 26.8% |

### Table VII

Average Number of Months by Race to
Promote Out of Utility

| Race | Number who were<br>promoted above<br>Utility | Average number<br>of months |
|---|---|---|
| White | 95 | 3.3 |
| Black | 40 | 9.7 |

Table VIII

Number and Percentage by Race of Non-probationary Employees
with Prior Experience Whose Initial Assignment was in the
Utility Position and Who Moved Above the Utility Position

| Race | Number of non-probationary employees with prior experience whose initial assignment was in the Utility Position | Number who Were Promoted Out of Utility | Percentage who Were Promoted Out of Utility |
|---|---|---|---|
| White | 68 | 36 | 52.9% |
| Black | 61 | 19 | 31.1% |

Table IX

Average Number of Months by Race by Experience
to Promote Out of Utility

| Race/ Experience | Number who were promoted to jobs paying more than Utility | Average number of months |
|---|---|---|
| whites with prior experience | 37 | 3.9 |
| whites with no prior experience | 50 | 3.0 |
| Blacks with prior experience | 18 | 8.1 |
| Blacks with no prior experience | 22 | 11.1 |

Plaintiffs' Brief at 10, 12–16.

The Supreme Court, in *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), held: "Where gross statistical disparities can be shown, they alone may . . . constitute prima facie proof of a pattern or practice of discrimination." 433 U.S. at 307–08, 97 S.Ct. at 2741. Although proof of discriminatory motive is generally required in disparate treatment cases, the evidence of subjective, standardless decision-making by company officials, which is a convenient mechanism for discrimination, satisfies this requirement. *See Rowe v. General Motors Corp.,* 457 F.2d 348, 359 (5th Cir.1972). The company, after all, made no provision for informing employees of promotion opportunities nor did it establish any objective bases for judging the possible applicants. The explanation of plant manager Bobby Thornton for the scarcity of blacks in upper level jobs demonstrates the prejudice which must have entered into the decisions he made:

. . . their own choice, a whole lot—a lots of cases, it's their own choice as well as their experience, in other words, what probably I'm trying to say is our better jobs as far as less physical work and responsibility and what have you is in our semi-skilled jobs, they have less responsibility. It's usually an easier type of job, less physical work such as debark operator has a cushion he sits on all day, and he's got buttons to push, he has to know which button to push at which time, but it's a much easier job than a millwright. A millwright's job—he has to get down in the grease and the grit and grind and everything that he does is physically hard plus he has to have the knowledge and

the skill to do his job as quickly as possible to get the mill back in production and most of these people that you're talking about—this class of black people are satisfied with a semi-skilled job.... [T]hey're contented more so in a semi-skilled job than taking on the responsibility and extra hard work and long hours that maintenance requires.

Plaintiffs' Exhibit 41 at 53.

Plaintiffs' reliance on statistical evidence to prove a prima facie case of racial discrimination requires us to judge the statistical significance of the disparities charted above. Fortunately, the methodology to be utilized in arriving at this answer is clearly set out in *Castaneda v. Partida,* 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977). A binomial distribution statistical analysis of Tables I (initial assignment data) and VI (promotion data) demonstrates the statistical significance of the difference between the actual and expected number of blacks who received favorable initial assignments/promotions.[3]

■ In order to rebut this prima facie case of racial discrimination in employment, the defendant must come forward with evidence which either discredits the plaintiffs' statistical presentation or, in the alternative, provides a non-discriminatory explanation for the result. There is no dispute with the numbers listed in the tables printed below. Defendant, however, did present a number of challenges to the statistical proof offered by plaintiffs, which were adopted by the magistrate. First, defendant contended that the number of employees involved is too small to permit statistical evaluation of disparities in assignment and promotion. Defendant understates the size of the work force by maintaining that what is really involved here is simply a work force of sixty to seventy workers when the plant operated on one shift and 100 to 110 workers when the plant increased its operation to two shifts a day. A closer look at the exhibits presented by plaintiffs reveals that the initial assignment table considered the assignment of 761 employees and the promotion table considered 335 non-probationary employees. This suit involves, after all, a charge of continuing racial discrimination over a number of years; there is no merit to the proposition that at most 110 employees should be considered. This is irrelevant, however, because the dispositive point here is that the significance of the statistical data is shown by the test approved in *Castaneda* and *Hazelwood.*

The second basis upon which the court found the statistical evidence inadequate was the failure to standardize the data for qualifications. In determining the qualifications of employees, plaintiffs utilized all information listed on the individuals' employment applications.[4] This is insufficient,

---

3. The binomial distribution statistical analyses were computed as follows:

BINOMIAL DISTRIBUTION FOR TABLE I

| | | |
|---|---|---|
| Total Number in Pool | = | 444 + 317 = 761 |
| Percentage of Blacks | = | 41.7% |
| Percentage of Whites | = | 58.3% |
| Total Number Not Assigned to Utility (sample) | = | 90 + 22 + 112 |
| "Expected" Number of Blacks | = | 41.7% of 112 = 47 |
| Actual Number of Blacks | = | 22 |
| Difference | = | 25 |
| Standard Deviation | = | $\sqrt{112 \times .417 \times .583} = 5.2$ |
| Number of Standard Deviations | = | 25/5.2 = 4.8 |

BINOMIAL DISTRIBUTION FOR TABLE VI

| | | |
|---|---|---|
| Total Number in Pool | = | 178 + 157 = 335 |
| Percentage of Blacks | = | 46.9% |
| Percentage of Whites | = | 53.1% |
| Total Number Promoted (sample) | = | 84 + 42 = 126 |
| "Expected" Number of Blacks | = | .469 x 126 = 59 |
| Actual Number of Blacks | = | 42 |
| Difference | = | 17 |
| Standard Deviation | = | $\sqrt{126 \times .469 \times .531} = 5.6$ |
| Number of Standard Deviations | = | 17/5.6 = 3.04 |

4. Plaintiffs' exhibits considered the following types of experience relevant for jobs at the chip-n-saw mill:
   1. work in a sawmill;
   2. work in a logging or pulpwood operation;
   3. work in a wood products or paper mill;
   4. work at the New Orleans Furniture Company (a local business) in either the mill

according to defendant, because a number of witnesses testified in court about additional qualifications.

Although the defendant stressed the need for highly qualified individuals in many of the jobs at the plant, the plant manager testified that only one job required a skilled employee. The other jobs could be learned at the plant, in his opinion.

Q. On that same issue, it is also true that any job at your plant can be learned and has been learned at the plant?

A. That's true.

Q. There's no job, is there, for which—some companies simply will not hire people into a certain job unless they have had certain types of experience elsewhere? That is not the case at your plant.

A. That's not the case at this plant.

Q. And, in fact, every single one of these jobs that you've been talking about today have been learned by employees who have had no relevant prior experience, isn't that true?

A. No.

Q. Give me a list of the jobs at the Columbia sawmill that have not been learned by employees at the job but which have always been filled by persons who came with the necessary skills.

A. The lead electrician job has never been filled by a person.

Q. Are there others?

> department, the woodworking department or in a saw operator classification;
> 5. work in a craft represented at the sawmill;
> 6. work as an operator of the type of heavy equipment found at the plant.

**5.** The plant manager presented the following evidence about the way by which individuals progress to higher paying, more responsible jobs:

> Well, most of these particular people right here that move through this plant from one job to another learn the fundamentals and learn how to operate this particular type of equipment at times whenever they always have an opportunity to watch and observe and just, say, for a few moments at a time

A. I can't think of any.

Record on Appeal, vol. 10 at 983–84.

■ The plant manager stated that the company had adopted a policy of promoting to upper level positions on the basis of training received at the plant.[5] It is the rule in this Circuit that where unskilled persons are hired and then promoted on the basis of training received on the job, a disparity between the number of whites and blacks promoted is significant. It is unnecessary to standardize the data for qualifications.

The Company's entry level hiring policy is a distinctive circumstance in this case supporting the inference of discrimination. When a company adopts a policy and practice of hiring in at low-level unskilled jobs and promoting to upper-level [positions] based upon training received and skills developed at the plant itself, it cannot convincingly challenge the *prima facie* showing under the *Hazelwood* "qualifications" dicta. Where skills are commensurate with company training, we will approve statistical comparisons between racial make-up in key positions and racial composition in the total work force. See, *James v. Stockham Valves,* [559 F.2d 310] at 341 [ (5th Cir.1977) ]; *Scott v. City of Anniston,* [597 F.2d 897] at 901 [ (5th Cir.1979) ].

*Fisher v. Procter & Gamble Mfg. Co.,* 613 F.2d at 544.

Defendant points to a line of cases in which the failure to standardize data for qualifications was judged fatal to the plain-

> run these particular types of equipment. And usually they let it be known by doing this type of thing or talking to their foreman about they want to learn to run so and so, whichever type of equipment it is. And they are made available when the operator is off for a day or some situation like that. These people have an opportunity to fill in and to learn how to operate this different equipment. *And I think I could apply this to any job that we have. If a man wanted to and showed that he has initiative to learn and has ability to do the job, I believe he could promote to any one of those jobs, to any other job that he wanted to.*

Record on Appeal, vol. 10, at 943.

tiffs' statistical case. *E.g., Pouncy v. Prudential Ins. Co.,* 668 F.2d 795 (5th Cir.1982); *Rivera v. City of Wichita Falls.* Unlike the case at bar, however, those cases considered jobs involving skills not generally possessed or readily acquired by the general population. The Supreme Court, in *Hazelwood School District v. United States,* set forth the reason that the two types of cases must be viewed differently.

> In Teamsters, the comparison between the percentage of Negroes on the employer's work force and the percentage in the general areawide population was highly probative, because the job skill there involved—the ability to drive a truck—is one that many persons possess or can fairly readily acquire. When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value.

433 U.S. at 308 n. 13, 97 S.Ct. at 2742 n. 13. Since the plant manager plainly stated that all but one of the jobs could be learned on the job, this case certainly corresponds to the line of authority represented by *Fisher v. Procter & Gamble Mfg. Co.,* and qualifications need not be considered in making an accurate statistical picture.

■ The final reason for rejection of the statistical evidence was defendant's presentation of evidence about a few of the promotion decisions and why blacks were not placed in these positions. This attempt to combat a prima facie case with evidence about a handful of promotion decisions is doomed to failure because a prima facie case of class-wide discrimination "is not met by [defendant's] attempts to parry specific allegations of alleged discrimination ...." *United States v. Hayes International Corp.,* 456 F.2d 112, 120 (5th Cir.1972). Defendant contends that its articulation of allegedly legitimate reasons for some promotion decisions should work to shift the evidentiary burden back to plaintiffs to demonstrate that the proffered reasons are a pretext for discrimination. However, the burdens of proof and production set out in *Texas De-*partment of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1982), apply only to *individual* disparate treatment cases. In order to combat a case of class-wide discrimination based upon statistical evidence, defendant must either show flaws in the plaintiffs' statistics or provide a non-discriminatory explanation for the result. This burden will not be met by general assertions of good faith or of hiring only the best applicants. *Teamsters v. United States,* 431 U.S. at 342 n. 24, 97 S.Ct. at 1858 n. 24.

In addition to the reasons adopted by the court below, the defendant urges that the statistical evidence should be discounted because the exhibits impermissibly mixed conduct for which liability might attach and conduct barred by the limitations period.

This court has recently reaffirmed in *Rivera v. City of Wichita Falls,* that the standards for judging claims of pattern or practice employment discrimination under Title VII and Section 1981 are identical. 665 F.2d at 534 n. 4. Therefore, the plaintiffs' case is not adversely affected as long as the incidents upon which the statistical evidence is built fall within one of the limitations periods. Defendant reasons that the applicable statute of limitations governing this case is the Mississippi three years statute, Miss.Code Ann. § 15–1–29 (1972). Since some of the individuals whose employment history was reflected in the tables were hired shortly outside this limitations period, the defendant argues for the rejection of the entire battery of statistical evidence.

■ Although correct in its judgment that unlawful conduct which has not been made the subject of a timely charge is, in the words of the Supreme Court, "merely an unfortunate event in history which has no present legal consequences," *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977), the defendant is incorrect in his assumption that the rule works to the plaintiffs' detriment in this action. This Court has held that the statute of limitations applicable to

Section 1981 claims is the six year Mississippi catch-all statute, Miss.Code Ann. § 15–1–49 (1972). *Payne v. Travenol Laboratories, Inc.*, 673 F.2d 798, 815 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 451, 74 L.Ed.2d 605 (1983); *Truvillion v. King's Daughters Hospital,* 614 F.2d 520, 528 (5th Cir.1980). The limitations period reaches more than two years before any of the hiring at this plant occurred. Accordingly, we find that all statistical material presented by plaintiffs may properly be considered.

## CONCLUSION

Regrettably, we cannot bring this case to final resolution today. We do, however, lay the groundwork which should enable the court below to finish this task in short order.

First, we reverse the court's denial of class certification and instruct the court below to certify plaintiffs Boykin and Powell as class representatives for both the initial assignment and promotion claims. Secondly, we reverse the court's judgment on the liability issue and order the district court to enter judgment for plaintiffs on both the initial assignment and promotion claims. The entry of judgment for plaintiffs on their claims of class-wide discrimination brings this case into Stage II. *See Baxter v. Savannah Sugar Refining Corp.,* 495 F.2d 437, 443–44 (5th Cir.1974), *cert. denied,* 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1975). *See also James v. Stockham Valves & Fittings Co.,* 559 F.2d 310, 354–59 (5th Cir.1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978). A notice must be sent to each member of the class informing him of his entitlement to make a claim. The named plaintiffs, as every other black employee in the class, are entitled to the presumption that arises from the finding of discrimination

and should be entitled to make a claim for back pay and other relief.

Finally, the finding of past discrimination makes appropriate the examination of defendant's present practices in order to evaluate the propriety of granting injunctive relief. We are unable to perform this task on a record that includes no information after the 1976 trial of this case; we, therefore, remand this issue for the district court to undertake this inquiry.[6]

REVERSED AND REMANDED.

---

**6.** As a point of cross-appeal, defendant argues that the magistrate improperly denied its motion for attorney's fees. In Title VII cases, attorney's fees will be awarded where the action is "frivolous, unreasonable, or groundless." *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). Defendant maintains that the action was brought in bad faith and that attorney's fees are consequently mandated. The foregoing discussion of this case makes it very clear that this is a legitimate action. The reversal of the magistrate's decision on the merits clearly precludes us from awarding attorney's fees to the defendant.