**Ann McDOWELL, Plaintiff,**

v.

**MISSISSIPPI POWER AND LIGHT, Defendant.**

**Civ. A. No. J84–0723(L).**

United States District Court,
S.D. Mississippi,
Jackson Division.

July 31, 1986.

Alison Steiner, Andalman, Adelman & Steiner, Hattiesburg, Miss., for plaintiff.

Paul O. Miller, III, Miller, Milam & Moeller, Jackson, Miss., for defendant.

## MEMORANDUM OPINION

TOM S. LEE, District Judge.

This cause came before the court for trial on the complaint of the plaintiff, Ann McDowell, a white female, alleging that defendant Mississippi Power & Light Company (MP & L), an employer within the meaning of 42 U.S.C. § 2000e(b), (g), (h) and (i), discriminated against her on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* The court heard testimony and received exhibits offered into evidence by counsel.

Grand Gulf Nuclear Station (GGNS) is a nuclear generating facility located near Port Gibson, Mississippi which is maintained and operated by MP & L. The reactor is operated by employees in various stages of training, the lowest being that of nuclear operator trainee, a position occupied for three to eighteen months depending on experience. The trainee progresses to the levels of auxiliary operator and then nuclear operator B. To attain the next step, nuclear operator A, an employee must be licensed by the Nuclear Regulatory Commission (NRC).

Radioactive waste from the reactor is processed by Radwaste operators, who need not be NRC-licensed. Radwaste operators begin, like potential licensed operators, as nuclear operator trainees. Following completion of that stage, they transfer out of the licensing progression and into Radwaste which is in a separate location from the nuclear operators.

In late 1982 or early 1983, a member of MP & L's personnel office in Jackson held a meeting regarding the company's affirmative action program, noting a deficiency of women in the operations trainee program. According to MP & L's affirmative action program, when a deficiency in women or blacks is identified, the company will make specific efforts to overcome the deficiency. In a deficient area in which outside hiring is done, the equal employment officer is to require certification that any white or male hired "possesses demonstrably superior job related qualifications."

From 1981 to 1983, plaintiff worked at Commonwealth Edison's Dresden Nuclear Power Station in Morris, Illinois. At Dresden, plaintiff had satisfied the seniority requirements to be eligible for the next training class leading to licensing as a nuclear operator. Don McDowell, whom plaintiff later married, also worked for Dresden. He was offered a position with Quadrex Corporation, a subcontractor of various utilities including MP & L, at GGNS for approximately three years.[1] To determine whether he wanted to accept the position, he and plaintiff traveled to Port Gibson to see the facility and the area in March 1983. While there, plaintiff went to the GGNS personnel office and completed an application form, indicating her nuclear experience and her preference for employment in power generation. In her interview with Robert Halbach, Administrative Superviser with personnel responsibilities, plaintiff discussed the Port Gibson area, schools and her experience. Halbach took several lengthy phone calls during the conference. He called plaintiff the next day and took her to interview with Roy Keeton, operations superintendent, the person responsible for hiring nuclear operator trainees and Radwaste workers at that time. She and Keeton discussed her work at Dresden and the shifts, benefits and job progression at GGNS. She told Keeton as well as Halbach that she was also interested in Radwaste. Keeton advised plaintiff that she was hirable and that GGNS had several immediate openings, including two in Radwaste, in which plaintiff expressed interest. At the end of her discussion with Keeton, she told him that she was not certain when she would be available for

---

**1.** McDowell ultimately worked as a shift advisor although he and plaintiff initially thought he would be a training instructor.

employment and he said that she should call him when she knew.[2]

Plaintiff returned to Illinois and attempted to call Keeton and Halbach as requested, an endeavor which proved to be futile.[3] In July, plaintiff married Don McDowell who had accepted the job with Quadrex at GGNS. After moving to Port Gibson, she went again to Halbach's office where she completed another application on August 28 and talked with Halbach. They discussed her husband's job and Halbach stated he would contact her later about the screening process leading to employment. When Halbach did not contact plaintiff, she returned to his office in September and he told her she could go through the screening in two weeks. No mention was made of plaintiff's husband or his job.

Halbach sent the August application to Keeton with a note which stated: "This gal interviewed with you several months ago. Husband is Quadrex [training instructor]— says he hopes to stay here after the 3 year contract is up." Keeton returned the application to Halbach with a note dated September 7, 1983 and stating: "He's not a training inst. He's a Shift Advisor in Ops. I need to talk to you about this one. No until we talk." Keeton called McDowell at home and asked if his wife had applied for the job. McDowell, who placed this conversation two to six weeks after plaintiff's August application, testified that Keeton asked about plaintiff's ability and then said the application would be handled in the usual manner. In a note dated October 19 on plaintiff's August application, Halbach noted that Keeton was "concerned of a conflict of interest since her husband is a 'Shift Advisor.'"

A shift advisor is responsible for monitoring equipment and for overall observation of technical aspects of the plant and must always be within ten minutes of the control room, that being the advisor's primary station. As a shift advisor, Don McDowell was supervised by Quadrex personnel, but gave reports and recommendations to MP & L supervisors and shift superintendents. He was not authorized to operate any of the equipment. Regarding contact between a shift advisor and the various stages in the licensing procedure, Keeton testified that an operator trainee spent approximately ten percent of her time in the control room, an auxiliary operator about twenty percent and a nuclear operator B about thirty percent. During this time, the shift advisor had no supervisory authority over any of these positions and any contact was brief and casual.

Plaintiff never received notification from Halbach that she would not be hired although Halbach testified he would have written her eventually. When the McDowells did not hear any more about the plaintiff's application, Don McDowell, at the end of September or first of October, asked a friend who carpooled with Keeton, and learned that plaintiff would not be offered the job because of MP & L's anti-nepotism policy.

In September or October 1983, plaintiff made several applications for jobs in the area. In January 1984, she returned to college, but in July 1984 she applied for the position at River Bend Nuclear Plant that she accepted and now holds. She began

**2.** Defendant argued at trial that plaintiff's application was only valid for thirty days and that she did not attempt to make further contact with Keeton or Halback until after the application had terminated. The testimony showed that no mention was made of the thirty-day duration of the application when Keeton told her to call him later. The company's failure to act on plaintiff's March application is not the basis of this court's finding of discrimination because, by plaintiff's own testimony, her visit to GGNS and completion of that application were merely an expression of interest. Additionally, the March application is outside the 180–day period preceding filing of the charge. The manner in which plaintiff was treated when trying to reach Keeton and Halbach by telephone is, however, indicative of a general sexist attitude at GGNS.

**3.** Plaintiff's telephone bills indicate repeated calls made to the GGNS switchboard, which connected her with the office of Keeton and Halback. Halback testified that he tried to return the calls twice but Keeton apparently never did although he slightly remembered receiving the messages.

work at River Bend on November 28, 1984 and, until July 1985, rented a trailer near the plant for $300.00 per month and commuted the 230 mile roundtrip between the plant and her family's home in Vicksburg.

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on November 19, 1983.[4] Following conciliation efforts, the Commission issued a right to sue letter on August 27, 1984 and plaintiff brought this suit on September 28, 1984.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the United States Supreme Court established the allocation of burden of proof in a Title VII action. The plaintiff must first establish a prima facie case of discrimination, consisting of proof (1) that she is female; (2) that she applied for and was qualified for a position for which the employer was seeking applications; (3) that she was rejected for the position; and (4) that the employer continued to seek applicants with plaintiff's qualifications. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Plaintiff clearly made a prima facie case.[5]

The burden then shifts to defendant to articulate some legitimate non-discriminatory reasons for its actions. Here, MP & L presented evidence to the effect that it refused to hire plaintiff because of its anti-nepotism policy which states:

> Discretion must be used in considering the employment of relatives of existing members of the organization, and no relative shall be employed without the prior approval of the director of personnel. In general it is not desirable for close relatives [6] to work in the same department or division.

> In no case and under no circumstances shall close relatives be employed to work under the same supervisor or in jobs where the performance of their duties brings them in close contact.

The burden then shifts back to plaintiff to prove by a preponderance of the evidence that the reasons offered by plaintiff were mere pretext. The court is of the opinion that plaintiff satisfied this burden.

■ Plaintiff was clearly not subject to the express provisions of the policy which absolutely prohibit employment since she was not related to an MP & L employee.[7] While the question of hiring a close relative of a contractor had apparently never arisen previously,[8] plaintiff's exhibit 14 includes personnel files of people who, like plaintiff, were not covered by the express language of the policy in that they were related, although not closely related as used in the policy, to an MP & L employee.[9] These

---

**4.** The charge, pursuant to statute, covers discriminatory acts occuring up to 180 days prior to filing of the charge. Therefore, any conduct by MP & L prior to that time is not actionable. It is, however, admissible as circumstantial evidence of discrimination.

**5.** The parties stipulated that plaintiff was qualified and applied for a position with MP & L. The evidence clearly showed that plaintiff is female, that she was rejected by MP & L and that MP & L continued taking applications.

**6.** The policy does not define "close relative" but Halback testified that he interpreted the term as it is used in the company's funeral policy: husband, wife, brother, sister, mother, father, mother-in-law, father-in-law.

**7.** In accordance with its haphazard application of the policy, MP & L had exercised discretion and offered accomodations in order to employ even those people whom it was absolutely pro-

hibited from employing. The fact that two women, Catherine Krupa and Roslynn Pogue, whose husbands were MP & L employees, were employed in spite of the express language of the policy does not vitiate plaintiff's case since these two women were not similarly situated with plaintiff, they being subject to the express provisions of the policy and plaintiff not being so. Additionally, neither Catherine Krupa nor Roslynn Pogue is employed in operations.

**8.** Stewart Frame, Vice President of Personnel, testified that he was not aware of any couples composed of an MP & L employee and the employee of a contractor. He further stated that no specific policy governed employment when such a relationship was involved.

**9.** Billy Lewis (P–14–A) is the step-brother of Phillip Huff; Roy Keeton (P–14B) is the brother-in-law of Charles Ellsaesser (P–14C); Ernest Mathes (P–14D) is the first cousin of Pat Womack (P–14E); Pat Womack (P–14E) is the second

applicants were all male and were all hired; with only one exception, they were apparently never questioned about their family relationship with the MP & L relative or their business relationship with that relative in the job for which they were applying. Plaintiff, on the other hand, a female, was subjected to an individual assessment.

The one exception was Charles Ellsaesser, brother-in-law of Roy Keeton.[10] Ellsaesser applied for and was offered a position wherein Keeton would be his immediate supervisor. Following an individual assessment of the situation, MP & L officials determined that that Ellsaesser and his supervisor would not be in close contact and would not work under the same supervisor. Plaintiff, on the other hand, would report to an MP & L supervisor and, in her first year, spend less than ten percent of her time in the general proximity of her husband who reported to a Quadrex supervisor and would have neither observed nor supervised plaintiff. Under the same analysis of the policy which allowed the hiring of Ellsaesser, MP & L determined that employment of plaintiff would violate the policy.

The testimony also showed that MP & L was willing to employ an applicant on certain conditions designed to avoid violation of the policy. Defendant introduced into evidence forms completed by three men stating that they would never request transfers to departments in which their brothers or fathers were employed. Such

a compromise was not offered to plaintiff although one such accomodation was readily available. On both the March and August applications, plaintiff had indicated interest in power generation and told Halbach and Keeton she wanted to pursue a license, but she also inquired about Radwaste positions. In fact, Keeton told her during her interview about Radwaste openings. The anti-nepotism policy, as interpreted by MP & L, foreclosed her pursuit of a license. Her employment in Radwaste, however, would arguably not do so because, after her initial training, she and her husband would work in different areas of the plant.[11] Plaintiff was never consulted about this option although several male applicants who were accepted in the licensing program transferred to Radwaste upon completion of training.

The Fifth Circuit has often held that "subjective, standardless, decision-making by company officials ... is a convenient mechanism for discrimination."[12] *See, e.g., Rowe v. General Motors Corp.*, 457 F.2d 348, 359 (5th Cir.1972). It is clear that MP & L's application of its anti-nepotism policy was absolutely without standards. The only guidelines for use of the policy are included therein and obviously not applied with any consistency. Additionally, there are no safeguards against error as evidenced by plaintiff's situation where Keeton's decision was not subject to review or question.[13] The Fifth Circuit has also held

---

cousin of Douglas Womack; Steve Angel (P–14F) is the brother-in-law of Pat Womack (P–14E); Larry Moulder (P–14G) is the first cousin of Bryan Warren (P–14H); James Kelly McDonald (P–14I) is the cousin of Jeffrey Purvis (P–14J); David Monk (P–14K) is the brother-in-law of Gary McKey (P–14L).

10. At trial, defendant elicited testimony that Ellsaesser and Keeton were actually not brothers-in-law but were instead married to sisters. Ellsaesser's application, however, states that he is the brother-in-law of Keeton and the memorandum in the personnel file regarding the relationship refers to Ellsaesser and Keeton as brothers-in-law.

11. Keeton told plaintiff during her interview that she would progress through the trainee program faster than applicants with no experi-

ence. If she had been accepted in the Radwaste program, she would then have, according to Keeton's testimony, had occasion to go to the control room approximately three times every seven days, each time for ten minutes to two hours, although she would not have been subject to supervision by her husband.

12. In *Boykin v. Georgia-Pacific Corp.*, 706 F.2d 1384, 1390 (5th Cir.1983), the Fifth Circuit stated that such decision-making satisfies the requirement of discriminatory motive in disparate treatment cases. In *Page v. U.S. Industries, Inc.*, 726 F.2d 1038, 1053 (5th Cir.1984), the Fifth Circuit limited *Boykin* to its facts which included a system devoid of any objective bases for judging applicants and supporting statistics.

13. Halbach apparently rubber-stamped Keeton's decision as his testimony demonstrated he knew

that if an employer believes that a policy is violated, the employer is not guilty of discrimination if it makes an employment decision based on that belief. *See Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1256 (5th Cir.1977). This is not to say, however, that an employer can avoid a finding of discrimination by asserting belief in an incredible conclusion. *Id.* at 1256 n. 6. In this case, Keeton, who was familiar with the laxity with which the policy was applied in the case of his brother-in-law, concluded that the policy should be applied to plaintiff. There was no evidence that different standards or considerations were warranted because of the positions involved in plaintiff's case. Although hesitant to intrude in the business decisions of a company, the court is of the opinion that defendant's position that plaintiff was denied employment because of the anti-nepotism policy is not credible.

The court's finding is further supported by general evidence of a pervasive sexist attitude at GGNS. Halbach's initial note to Keeton referred to plaintiff as "this gal"[14] and noted that her husband was employed with Quadrex and intended to stay in the area when his job was completed. Review of the personnel files indicates that whether an applicant, male or female, intended to remain in the area was important to MP & L. That MP & L viewed plaintiff's intentions to become a long term employee in terms of her husband's plans is, however, reliance on a sexual stereotype, the inaccuracy of which is evidenced by the fact that plaintiff and her husband now reside near her work and her husband travels.

That defendant has an affirmative action policy does not weigh in its favor since it is apparently nothing more than a piece of paper. The company had noted a deficiency of women in operations[15] but, in spite of this, could not identify any specific attempts to attract women[16] except for one female applicant who was flown at company expense to Port Gibson although ultimately not hired. The company also failed to issue a certification of superior qualifications when men were hired in the deficient department. The general treatment of plaintiff must also be noted. Halbach at best made perfunctory efforts to return plaintiff's calls while Keeton, who had requested the calls, did not even do that much.[17] Plaintiff was also never informed of the potential conflict; Keeton told Don McDowell that the application would be handled in the usual way although Keeton by that time at least suspected that such would not be the case.

The court concludes that the defendant's anti-nepotism policy was applied to foreclose plaintiff's employment, utilizing stricter standards to assess plaintiff's situation than those applied to similarly situated men who generally were not subjected to any consideration under the policy. The plaintiff has, therefore, established by a preponderance of the evidence that defendant intentionally discriminated against her and such conduct was "the standard operating procedure—the regular rather than unusual practice" at MP & L. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977). *See also Walls v. Mississippi State Department of Public Welfare*, 730 F.2d 306, 322 (5th Cir. 1984). That defendant's conduct was intentional discrimination is further supported by the company's admitted recognition of a

little about the duties of the positions involved. Had Keeton approved the hiring of plaintiff, his decision would have been reviewed by Stewart Frame, Vice President of Personnel. Keeton's negative decision was not reviewed further.

**14.** References to men in similar notes were more positive and less demeaning.

**15.** At the time of plaintiff's application, 96 people had worked in operations and only four were women.

**16.** Defendant introduced into evidence newspaper advertisements for nuclear operations trainees. The advertisements do not emphasize that women are encouraged to apply but do state that MP & L is an equal opportunity employer.

**17.** Halbach testified that he was extremely busy during the time plaintiff attempted to call him. Guy Patterson, a male, testified, however, that he had no trouble contacting Halbach when he applied at GGNS several months before plaintiff.

deficiency of women in operations and failure to adhere to its affirmative action policy and by the company's general treatment of plaintiff during the application process.

Having determined that the defendant discriminated against the plaintiff in violation of Title VII, the court turns to the issue of remedies. 42 U.S.C. § 2000e–5(g) states that the court

> "may ... order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate."

The language of section 2000e–5(g) provides the court with discretion to fashion an equitable remedy. The court's discretion is to be guided by standards consistent with the purposes of Title VII. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416–17, 95 S.Ct. 2362, 2370–71, 45 L.Ed.2d 280 (1975). Those purposes include achieving equality of employment opportunities, *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–30, 91 S.Ct. 849, 852–53, 28 L.Ed.2d 158 (1971), and making whole the victims of discrimination, *Albemarle*, 422 U.S. at 418, 95 S.Ct. at 2372.

■ The court is of the opinion that plaintiff is entitled to the remedy of back pay from the date of discrimination to present to the extent supported by the facts. Halbach testified that three to six months generally passed from the time of application to the time an applicant began work.[18] Hence, the court finds plaintiff should have started work in January 1984. By that time, however, she had returned to college. Plaintiff contends that she is entitled to back pay for the time during which she was enrolled in college. In support

thereof, she cites cases where back pay has been awarded to plaintiffs who enrolled in college following extensive and futile job searches and continued making applications for employment while in college. *See, e.g., Nord v. United States Steel*, 758 F.2d 1462, 1471 (11th Cir.1985) (enrollment in college did not foreclose plaintiff's right to back pay because of lack of evidence showing her unavailability work during that time); *Brady v. Thurston Motor Lines*, 753 F.2d 1269, 1275 (4th Cir.1985) (plaintiff who "searched diligently" for employment for one year then enrolled in college and continued job search entitled to back pay). *Cf. Harper v. Thiokol Chemical Corp.*, 619 F.2d 489, 494 (5th Cir.1980) (plaintiff who made "serious efforts to obtain employment" before becoming pregnant entitled to back pay). Here plaintiff applied for several jobs in August and September of 1983 and did not make any efforts to find employment while in college until June 1984 when she applied for a position at River Bend. The court is therefore of the opinion that plaintiff withdrew from the job market until June 1984. Although she did not begin work at River Bend until November 28, 1984, she is nonetheless entitled to back pay from June 1984 because it was at that time that she actively re-entered the job market.

■ Defendant contends that plaintiff failed to mitigate her damages by not accepting an alleged offer of employment made at the EEOC Fact Finding Conference.[19] According to the testimony, MP & L officials merely told plaintiff that positions were available at GGNS. In *Ford Motor Co. v. EEOC*, 458 U.S. 219, 241, 102 S.Ct. 3057, 3070, 73 L.Ed.2d 721 (1982), the

---

**18.** Approximately five months elapsed from the time plaintiff applied for her job at River Bend before she started work there.

**19.** In *Figgs v. Quick Fill Corp.*, 766 F.2d 901 (5th Cir.1985), the district court had admitted testimony offered by the defendant regarding an offer of employment made during EEOC proceedings. The Fifth Circuit concluded that the plaintiff's testimony established that the offer was made and held that *"if* the [district] court did err, the error was harmless because other

competent evidence" was sufficient to uphold the district court's findings. *Id.* at 903 n. 3 (emphasis original). At trial, this court reserved ruling on the admissibility of testimony regarding the alleged offer made at the Fact Finding Conference. The record here clearly demonstrates that an unconditional offer of employment was not made. Plaintiff's objection is overruled but the court attaches no significance to the testimony.

United States Supreme Court held that "absent special circumstances, the rejection of an employer's unconditional job offer ends the accrual of potential back pay liability." Here no job offer was made; defendant at best merely offered to consider plaintiff's application.[20]

Back pay is calculated as follows:

| | |
|---|---|
| 6/1/84 – 10/15/84 | $ 5,665.50 |
| 4½ mos. as operations trainee at $1259.00 per month | |
| 10/15/84 – 12/3/84 | 2,005.50 |
| 1½ mos. as operations trainee at $1337.00 per month | |
| 12/3/84[21] – 6/1/85 | 14,172.00 |
| 6 mos. as radwaste operator at $2362.00 per month | |
| 6/1/85 – 10/15/85 | 10,683.00 |
| 4½ mos. as radwaste operator at $2374.00 per month | |
| 10/15/85 – 7/31/86 | $23,322.50 |
| 9½ mos. as radwaste operator at $2455.00 per month | |
| TOTAL GGNS salary [22] | $55,848.50 |
| 1984 | $ 1,863.15 |
| 1985 | 30,170.50 |
| 1986 (through 7/31/86) | 14,730.00 |
| TOTAL interim earnings [23] | $46,763.65 |

Plaintiff is also entitled to reduce her actual earnings by a reasonable amount for travel and expenses:

| | |
|---|---|
| (1) 230 mile roundtrip at $.20 per mile for 30 weeks (11/28/84–7/1/85) | $1,380.00 |
| (2) $300.00 per month for mobile home rent for 7 months (11/28/84–7/1/85) | 2,100.00 |
| TOTAL | $3,480.00 |

20. In its memorandum, defendant characterized the testimony as "a statement that the defendant's anti-nepotism [policy] would not prevent employment of plaintiff in areas other than nuclear plant operations and that there were job opportunities available for which she should apply and be considered."

21. Roy Keeton testified that operations trainees were promoted after three to eighteen months in that position, depending on experience. Because plaintiff had previous nuclear experience and because an opening existed in radwaste on

Therefore, plaintiff is entitled to an award of back pay in the amount of $12,-564.85.

Plaintiff also asserts that she is entitled to compensation not only for the damages she has suffered to date, which are covered by the court's award of back pay, but also for future effects of discrimination. Such relief includes "front pay," a monetary award calculated to cover the period between the date of the order granting relief and the time at which the plaintiff attains her "rightful place," that is, the position she would have held absent discrimination. *James v. Stockham Valves & Fittings Company*, 559 F.2d 310, 358 (5th Cir.1977). Other available relief includes reinstatement or front pay in lieu of reinstatement.

The Fifth Circuit has consistently held that reinstatement "should be granted in all but unusual cases." *See, e.g., George v. Farmers Electric Cooperative, Inc.*, 715 F.2d 175, 178 (5th Cir.1983). This language is used, however, in the context of a district court's denial of a plaintiff's request for reinstatement. *See id.* The parties have not directed the court to a Title VII case in which the plaintiff seeks front pay in lieu of reinstatement, as Ms. McDowell does here. Remedies available under Title VII are intended to make the plaintiff whole; she should not be entitled, however, to choose her remedy to the extent it results in a windfall. Based on the facts of this case, this court is of the opinion that an award of front pay in lieu of reinstatement is appropriate.

December 3, 1984, the court hypothesizes that she would have been promoted on that day.

22. The salary calculation is taken from P–7. No allowance is made for overtime, shift differentials or fringe benefits because the evidence does not provide a basis from which to calculate a value for these items.

23. The amounts used to calculate plaintiff's interim earnings are taken from stipulations contained in the pretrial order and plaintiff's testimony that she now earns $491.00 per week.

Plaintiff's "rightful place" is a radwaste position with a salary corresponding to the length of time she would have been an employee of MP & L absent discrimination. That salary, according to the court's hypothetical job progression based on the evidence and utilized to calculate back pay, is $2455.00 per month. According to the court's hypothesis, plaintiff would be promoted to a radwaste position within six months of reinstatement. She is nonetheless entitled to a salary of $2455.00 during those six months. Front pay in lieu of reinstatement for that six-month period should then be $1964.04, an amount which, when added to her salary at River Bend of $2127.66 per month, equals $2,455.00 per month.[24]

If plaintiff were actually reinstated, any front pay to which she would be entitled after her promotion to radwaste would be supplementation of her salary to equal that of a radwaste operator with two additional years of seniority.[25] Assuming plaintiff were promoted to radwaste in February 1987, she would receive a salary of $2525.00 per month. A radwaste operator with one or more years of experience earns $2537.00 per month. Therefore plaintiff is entitled to an additional $12.00 per month for twelve months, or $144.00. At this point, plaintiff's right to front pay ceases. The proof did not establish whether further promotions were available to radwaste operators or whether plaintiff would be eligible or qualified for those promotions.

It is, therefore, the opinion of this court that plaintiff is entitled to an award of $14,672.89 in addition to reasonable attorney fees. A separate judgment in accordance with this opinion shall be entered according to the local rules.

**24.** If plaintiff were actually reinstated, she would be working for the first six months as an operations trainee at $2159.00 per month and would be entitled to a supplement of $1196.00, to raise her salary to $2455.00. Because plaintiff, by her own choice, will continue to work at River Bend where she earns $2127.66 per month, the supplement necessary to raise her salary to $2455 per month is only $327.34.

**25.** Here the court awards plaintiff the difference between her hypothetical salary at GGNS and the actual salary there if she were reinstated. The award would of course be greater if her hypothetical salary were compared to her River Bend salary. Such a comparison would, however, result in a windfall to plaintiff because she chose not to be reinstated.