Courtney GIBB, Plaintiff,

v.

DELTA DRILLING COMPANY, Keating V. Zeppa and H.J. Magner, Defendants.

Herbert A. KRUMBEIN, Plaintiff,

v.

DELTA DRILLING COMPANY, Keating V. Zeppa and H.J. Magner, Defendants.

Civ. A. Nos. CA 382–1208–G, CA 3–82–1837–G.

United States District Court, N.D. Texas, Dallas Division.

Dec. 12, 1984.

Stuart D. Wechsler and Robert Schachter, Goodkind, Wechsler & Labaton, New York City, W.D. Masterson, Robert M. Thornton and Roger F. Claxton, Kilgore & Kilgore, Inc., Dallas, Tex., for plaintiffs.

Edward Kliewer, Jr., Stephen R. Anderton, Kliewer & Hood, Dallas, Tex., Jerry P. Jones and Ralph I. Miller, Thompson & Knight, Dallas, Tex., for defendants.

**MEMORANDUM OPINION**

FISH, District Judge.

Plaintiffs Courtney Gibb and Herbert A. Krumbein [1] move for an order under Rule 23(c), Fed.R.Civ.P., determining that this action shall be maintained as a class action. The class for which plaintiffs seek certification under Rule 23(b)(3) consists of

the Plaintiff[s] and of all parties who acquired shares of common stock of Delta from March 12, 1981, through the date of filing [July 27, 1982] of this Complaint ("Class Period"), other than the Defendants and those in privity with them, who sold or retain such shares at a loss, including purchasers on the initial public offering of 2,000,000 shares of the Common Stock of Delta pursuant to a registration statement and prospectus dated on or about March 17, 1981, employee participants in Delta's Participation Plans who purchased 2,128,665 shares of Delta's Common Stock pursuant to a registration statement and prospectus dated on or about March 12, 1981 (the "Exchange Offering") and purchasers in the open market (the "Class").

Defendants [2] oppose class certification.

### I. Nature of the Suit

In this securities fraud case, plaintiffs principally complain about statements in two documents: the exchange offering prospectus dated March 12, 1981 and the stock offering prospectus dated March 17, 1981. Plaintiffs maintain that both documents contain misrepresentations, either because they are false or because they omit to state material facts.

According to plaintiffs' allegations, these misrepresentations are actionable under Sections 11 and 12 of the Securities Act, 15 U.S.C. §§ 77k and 77l; Section 10 of the Exchange Act, 15 U.S.C. § 78j, and the rules and regulations promulgated thereun-

---

1. By order of February 24, 1983, the case of Herbert A. Krumbein v. Delta Drilling Company, Keating V. Zeppa and H.J. Magner, formerly civil action number CA 3–82–1837–F, was consolidated with Courtney Gibb v. Delta Drilling Company, Keating V. Zeppa and H.J. Magner, civil action number CA 3–82–1208–G.

2. In addition to the corporation, those named as defendants are Keating V. Zeppa, chairman of the board and president, and H.J. Magner, director and senior vice president of production and exploration.

der, particularly Rule 10b–5, 17 C.F.R. 240.-10b–5; 18 U.S.C. §§ 1961–1968; and the statutory and common law of Texas. The motion for class certification was apparently served on defendants on November 4, 1982 but was not filed with this court until November 9, 1982, 15 days beyond the time allowed by the Local Rules of Practice for the Northern District of Texas.[3]

## II. Factual Background

Delta Drilling Company ("Delta") is engaged in the offshore contract drilling of oil and gas wells and the onshore exploration for and development and production of oil and gas. From its formation in 1931 until 1981, the common stock of Delta was owned, directly or indirectly, by its founders and their families. Sometime prior to March 17, 1981, Delta decided to offer shares of its common stock to the general public, by means of a stock offering prospectus, and to its employees, by means of an exchange offering prospectus. In connection with this initial public offering, Delta produced two prospectuses and filed two registration statements with the Securities and Exchange Commission ("SEC").

### A. The Exchange Offering

Effective January 1, 1974, Delta adopted two Participation Plans ("the Plans") for the benefit of certain of its employees. The Plans were to terminate if Delta "went public," in which event participating employees were to receive common stock in exchange for benefits surrendered under the Plans.

On November 6, 1980, the Plans were terminated and each employee participating in the Plans received one share of common stock for each Participation Unit ("unit") allocated to his account on that date under the terms of the exchange offer. At that time, there were 87 participating employees, who held an aggregate of 3,040,950 units. Consummation of the exchange offer was conditioned upon acceptance by participants holding at least 85% of the aggregate value of the units.

The exchange offer provided that the aggregate value of units accepted by participants would be distributed 30% in cash and 70% in shares of common stock. On March 12, 1981, Delta filed a registration statement with the SEC concerning the exchange offer. Between March 12, 1981 and March 16, 1981, the exchange offer was accepted by participating employees holding 100% of the units.

Each participant who accepted the exchange offer agreed, as a condition thereof, that he would not sell or transfer any shares of common stock received as a result of the exchange offer for a period of 120 days after commencement of the offering. Pursuant to the exchange offer, approximately 2,128,665 shares of common stock were issued to Delta employees.

### B. The Stock Offering

Pursuant to the registration statement filed with the SEC and dated March 12, 1981, and a stock offering prospectus dated March 17, 1981, two million shares of Delta common stock were offered to the public at a price of $17.50 per share.

### C. The Alleged Misrepresentations

According to the plaintiffs, both the exchange offering prospectus and the stock offering prospectus contained the following statements:

> Gas production almost doubled in 1978 reflecting a major gas discovery in January 1978, the South Culebra Bluff Unit No. 1 in Southeast New Mexico in which the Company holds a 50% working interest.

> \* \* \* \* \* \*

> Due to unusually high flow rates for the first six months of production, South Culebra Bluff Unit No. 1 contributed 25% of the Company's oil and gas revenues and a much higher percentage of operating income from oil and gas operations for 1978.

> \* \* \* \* \* \*

**3.** The import, if any, of this tardiness is addressed under the issue of Gibb's adequacy as a class representative.

In late 1976, the Company decided to expand substantially its exploration and development operations primarily in areas in which its contract drilling activities historically have been concentrated in order to benefit from its experience and knowledge in these areas.

The first two statements appeared in a section of the prospectuses headed "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the third in a section entitled "The Company."

Plaintiffs maintain that the first statement was a misrepresentation of a material fact because the South Culebra Bluff Unit No. 1 was not a "major gas discovery." The second statement was misleading, they say, because the prospectuses failed to explain that the "unusually high flow rates" were due to the fact that when the South Culebra Bluff well blew out, Delta was unable to bring it under control. Plaintiffs maintain that, without this information, they—and other investors—were misled to believe that the "unusually high flow rates" were due to "unusually large reserves of gas." Finally, plaintiffs claim that the third statement is both an affirmative misrepresentation and a misrepresentation by omission. This final statement misrepresents, in plaintiffs' view, the actual track record of Delta in the business of oil and gas exploration and development.

### D. Subsequent Developments

After this initial public offering of 2,000,000 shares at $17.50 each, Delta's stock experienced a brief rise to over $20.00 per share. Thereafter, the price of Delta stock continuously declined. By July 27, 1982, the date Gibb filed this suit, the price per share of Delta stock had fallen to $5.75 per share. Plaintiffs estimate that the investors in Delta were "left holding the bag" for more than $48 million in damages.[4]

### E. Plaintiff Courtney Gibb

Plaintiff Courtney Gibb is a resident of Leesburg, Virginia. She is employed by the United States Army Corps of Engineers, Middle East Division, as an interior designer.

The record reflects that Gibb had some experience with the stock market prior to the time that Delta offered its stock to the public. She testified by deposition that she probably learned of Delta from a prospectus mailed to her by Drexel Burnham Lambert Incorporated. As Gibb recalled it, after reading the Delta prospectus, particularly the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operation," she called her broker, Herbert A. Krumbein, also a plaintiff here, on March 17, 1981, and ordered 150 shares of common stock at a price of $17.50 per share, for a total cost of $1,625.00.

On April 21, 1981, Gibb sold all of her Delta stock for $17.00 per share, for a total loss of $75.00, plus an unstated amount of commissions.

### F. Plaintiff Herbert A. Krumbein

Plaintiff Herbert A. Krumbein, a resident of Arlington, Virginia, has been employed as a broker since March of 1978 by the brokerage firm of Drexel Burnham Lambert Incorporated. Krumbein has been a broker for over 20 years, during the last twelve of which plaintiff Gibb was one of his clients. Krumbein was Gibb's broker when she purchased the 150 shares of Delta stock in issue here.

Krumbein also purchased Delta stock for himself, though not at the time of the initial offering. Krumbein testified that on April 21, 1981, after reviewing an office file copy of Delta's stock offering prospectus, he purchased 150 Delta shares in the after-market at $17.25 per share. On November 25, 1981, Krumbein purchased an additional 150 shares at $9.625 per share. Then, on January 21, 1982, Krumbein sold

---

4. Plaintiffs reach this estimate by multiplying the number of shares issued in the offerings (2,128,655 to Delta's employees and 2,000,000 to the public) times the difference between the stock's price per share on March 17, 1981 ($17.50) and the price per share on the date that Gibb filed suit ($5.75), the dates which define the "class period" urged by plaintiffs.

his first 150 shares for $7.75 per share; on September 29, 1982, he sold the remaining 150 shares for $4.25 per share.

### III. Claims Involved

As stated earlier, plaintiffs' action seeks relief under several different statutes: Section 10 of the Securities Exchange Act of 1934, and the rules and regulations promulgated thereunder, particularly Rule 10b–5; Sections 11 and 12 of the Securities Act of 1933; Article 581–33 of the Texas Securities Act; Article 27.01 of the Texas Business and Commerce Code; and 18 U.S.C. §§ 1961–1968. Plaintiffs also assert claims under Texas law for common law fraud and negligence.

Before delving into the specific requirements of Rule 23, a review of these statutes, and of the common law claims as well, may significantly limit the number of issues to be addressed under Rule 23, Fed. R.Civ.P.

### A. Section 10 of the Securities Exchange Act of 1934 and Rule 10b–5

■ To make out a claim under Section 10(b), the plaintiffs must establish (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the plaintiffs relied (5) that proximately caused the plaintiffs' injury. *Huddleston v. Herman & MacLean*, 640 F.2d 534, 543 (5th Cir.1981), *modified on rehearing on other grounds*, 650 F.2d 815, *aff'd in part, rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

■ In this case, the element of reliance is the primary obstacle to certification of a class asserting a claim under Section 10 and Rule 10b–5. Reliance is a *causa sine qua non*, a type of "but for" requirement; stated another way, had the investor known the truth he would not have acted. *Huddleston*, above, 640 F.2d at 549. The rule in this Circuit is "reasonable reliance," which contemplates a subjective reliance standard, tempered by the requirement of due diligence on the part of each plaintiff. *Id.*, at 548. Thus, reliance is by its nature a matter of individual proof. *Id.*, at 549.

The necessity of individual proof ordinarily precludes a Section 10 and Rule 10b–5 claim from being asserted as a class action. *See, e.g., Simon v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 482 F.2d 880, 882 (5th Cir.1973) ("if there is any material variation ... in the degrees of reliance thereupon, a fraud case may be unsuited for treatment as a class action").

That is to say, individual questions of reliance ordinarily predominate over any common questions of fact or law. Plaintiffs concede the correctness of this conclusion, as applied to the facts of this case. Plaintiffs assert, however, two exceptions to this general rule which would allow the claims here to be treated as a class action: (1) an omission or non-disclosure theory and (2) a fraud on the market theory.

### 1. Omission or Non-Disclosure

■ Even if one or more of the three alleged misrepresentations in this case could be characterized as a misrepresentation by failure to disclose material facts, the issue of reliance is not removed from the case. Contrary to the assertions of plaintiffs, *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), and its progeny do not hold that reliance need not be shown in a non-disclosure case. Rather, because reliance is so difficult to prove when a defendant has failed to disclose material facts, the Supreme Court stated in *Affiliated Ute* that, in an omission case, the trier of fact may presume reliance where the plaintiffs could justifiably expect that the defendants would disclose material information.

In other words, *Affiliated Ute* established a presumption to allow plaintiffs to prove reliance more easily. When that presumption attaches, it may nevertheless be rebutted by a showing that the plaintiff did not rely on the defendant's duty to disclose. *Shores v. Sklar*, 647 F.2d 462, 468 (5th Cir.1981).

*Affiliated Ute* does not, therefore, eliminate reliance, an inherently individual issue, from the case but rather shifts between the parties the burden of proving or

disproving reliance. To the contrary, the Fifth Circuit has recognized that reliance remains an issue in all 10b–5 cases. The only difference between misrepresentation and non-disclosure cases lies in placement of the burden of proof: in the former, proof of reliance is a prerequisite to recovery; in the latter, proof of non-reliance is an affirmative defense. *Huddleston, above,* at 548.

As long as reliance remains an issue, it predominates over common questions of law or fact, thus precluding maintenance as a class action of plaintiffs' claims under Section 10(b) and Rule 10b–5.

### 2. Fraud on the Market

█ Plaintiffs assert a second exception to the general rule that reliance is an essential element of a Section 10 and Rule 10b–5 securities case: a "fraud on the market" theory. Plaintiffs are correct that proof of individual reliance may not be necessary where the plaintiffs are proceeding on a theory of fraud on the market. *Shores,* at 469. The concern in this case, however, is not with the validity of this proposition but with whether plaintiffs' claims are actually founded on a "fraud on the market" theory.

#### a. Theory of Fraud on the Market

In a "fraud on the market" securities case, a presumption of reliance on market price and the market itself substitutes for proof of individual reliance upon representations made in "face-to-face" transactions. *See In re LTV Securities Litigation,* 88 FRD 134, 142 (N.D.Tex.1980). This presumption is a recognition of the market's role as a "transmission belt" linking the misrepresentation to the individual purchaser or seller. The market, interposed between the seller and the buyer, transmits information to the investor in the processed form of a market price. The market is thus performing a substantial part of the evaluation process normally performed by the investor in a face-to-face transaction. *Id.* at 143.

The theory assumes that market price reflects all known material information.

*T.J. Raney & Sons v. Fort Cobb, Oklahoma Irrigation Fuel Authority,* 717 F.2d 1330, 1332 (10th Cir.1983). Investors, then, rely directly on the market to evaluate all known material information for them, rather than upon their own analysis of the information regarding a security. *In re LTV Securities Litigation,* 88 F.R.D. at 144.

A purchaser on the market exchanges may be either unaware of a specific false representation, or may not directly rely on it; he may purchase because of a favorable price trend, price earnings ratio, or some other factor. Nevertheless, he relies generally on the supposition that the market price is validly set and that no unsuspected manipulation has artificially inflated the price, and thus indirectly on the truth of the representations underlying the stock price. Whether he is aware of it or not, the price he pays for the stock reflects material misrepresentations. *Blackie v. Barrack,* 524 F.2d 891, 907 (9th Cir.1975).

#### b. Elements of a Fraud on the Market Case

In this Circuit, the leading case on the "fraud on the market" theory is *Shores v. Sklar,* 647 F.2d 462 (5th Cir.1981) (*en banc*). There the district court granted summary judgment for defendants, reasoning that plaintiff's admission that he had not read—and consequently could not have relied on—the offering circular for the securities in question (industrial development bonds) precluded any claim under Rule 10b–5. For the same reasons, the court refused to certify plaintiff's claim as a class action.

The Fifth Circuit affirmed the district court's ruling that proof of individual reliance is an essential element of a claim asserted under the second section of Rule 10b–5. As to the necessity of individual reliance for claims asserted under sections 1 and 3, however, the Fifth Circuit reversed the district court's ruling and remanded the cause for further proceedings, including a reconsideration of the maintainability of those claims as a class action.

The question addressed by the Fifth Circuit in *Shores* was one of first impression:

> whether a plaintiff must rely specifically on material misrepresentations or omissions in a single disclosure document when, in addition to charges based on its untrue statements or misleading omissions, other allegations would admit proof that the existence of the security in the market place resulted from the successful perpetration of a fraud on the investment community and that he purchased in reliance on the market.

*Shores,* 647 F.2d at 464.

As stated earlier, this specific question, which the Fifth Circuit answered in the negative, is not at issue in this case. Instead, the issue here is whether to avoid the predominance of individual issues of reliance, plaintiffs may rely on the exception to individual reliance recognized by the Fifth Circuit in *Shores.* Stated another way, the question here is whether plaintiffs have even asserted the basic elements of a fraud on the market case.

In *Shores,* the plaintiff, Clarence E. Bishop, Jr., alleged that he was the victim of a pervasive scheme to defraud members of the investing public and that the very existence of the security he purchased in the market place resulted from the successful perpetration of this fraud on the investment community. According to the Fifth Circuit, a fraud on the market case requires proof of the following three elements:

> (1) that defendants knowingly conspired to bring securities onto the market which were not entitled to be marketed, intending to defraud purchasers;
>
> (2) that plaintiff reasonably relied on the securities' availability on the market as an indication of their apparent genuineness; and
>
> (3) that plaintiff suffered a loss as a result of the scheme to defraud.

*Shores,* 647 F.2d at 469–70. *See also T.J. Raney & Sons,* 717 F.2d at 1332–33.

It is the first element that is doubtful in the present case. Though the Fifth Circuit did not explicitly state what must be shown to establish this first element, language used by the court in other portions of its opinion sheds light on the necessary proof. Bishop's complaint, said the Fifth Circuit,

> would permit proof that the defendants engaged in an *elaborate scheme* to create a bond issue that would appear genuine but was *so lacking in basic requirements that the bonds would never have been approved by the Board nor presented by the underwriters* had any one of the participants in the scheme not acted with intent to defraud or in reckless disregard of whether the other defendants were perpetrating a fraud.

*Shores,* 647 F.2d at 468 (emphasis added).

According to the court, use of fraud on the market theory is necessary to reach the "more *elaborate, intentional schemes* which deceive or defraud purchasers of securities" (emphasis added), *i.e.,* fraud beyond mere misrepresentations or omissions contained in a document. *Id.* at 472. In essence, the first element of *Shores* requires a "fraudulent scheme ... so pervasive that without it the issuer would not have issued, the dealer could not have dealt in, and the buyer could not have bought these Bonds, because they would not have been offered on the market at any price." *Id.* at 464 n. 2.

c. The Allegations in the Present Cases

The only portions of the complaints[5] here which might be construed to allege "fraud on the market" are as follows:

CLASS ACTION ALLEGATIONS

\* \* \* \* \* \*

... whether defendants perpetrated devices, schemes and artifices to defraud the investing public and the stockholders of Delta;

\* \* \* \* \* \*

... Plaintiff's claim is typical in that all shares or other securities purchased by

---

**5.** The allegations discussed below are identical

in these two consolidated cases.

the Plaintiff and members of the Class during the Class Period were purchased at prices which were artificially inflated by the false and misleading registration statements and prospectuses issued by Delta.

\* \* \* \* \* \*

## STATEMENT OF FACTS

\* \* \* \* \* \*

At the time of the Delta offerings successful oil and gas exploration companies, and particularly companies successful at finding gas reserves, were selling at a premium to the market, enabling Delta to sell its securities to its employees and the public at artificially inflated prices. Plaintiff and the Class relied upon, or are presumed to have relied upon, such misrepresentations.

\* \* \* \* \* \*

## FIRST CLAIM

[Violations of Section 10(b) of the Exchange Act and Rule 10b–5 Thereunder]

\* \* \* \* \* \*

Such misrepresentations and omissions were made with the intent to mislead and defraud the investing community, the general public and, in particular, persons who purchased shares of the common shares of Delta. Such conduct constituted a fraud upon the public market for Delta common stock.

\* \* \* \* \* \*

In carrying out the fraudulent and manipulative devices, conspiracy and scheme herein alleged, defendants acted both singly and in concert, directly and indirectly, by use of the mails and other means or instrumentalities of interstate commerce, and have violated, and/or aided and abetted violations of, Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder.

(Complaint, §§ 9, 10, 20, 22, 24).

Plaintiffs maintain that these allegations sufficiently pled fraud on the market:

Contrary to Defendants' allegations, Plaintiffs have properly pleaded fraud on the market within the holding of *Shores* by pleading all three subdivisions of Rule 10b–5 in both the Gibb and Krumbein Complaints, including the allegations in Paragraph 23 of both Complaints.[6]

(Plaintiffs' Reply to Defendants' Memorandum in Opposition to Motions for Class Certification at 72).

■ In sum, plaintiffs allege that (1) the price of Delta stock was artificially inflated; (2) they relied on the integrity of the market;[7] and (3) there was a scheme to defraud the public. For the reasons stated below, the court does not agree with plaintiffs that they have pled, or that their case is founded upon, a "fraud on the market" theory.

Plaintiffs' first and second allegations (i.e., an artificially inflated price and reliance on the market) are not sufficient to constitute fraud on the market without the third, *viz.,* that there was a "scheme" to

---

6. Paragraph 23 of the Complaints provides as follows:

As a result of the foregoing, in connection with the purchase and sale of in excess of 4,000,000 shares of the common stock of Delta pursuant to the Exchange Offering and the Stock Offering, and in connection with public trading thereafter during the Class Period, the Defendants, directly and indirectly, by the use or instrumentalities of interstate commerce or of the mails within the Northern District of Texas and elsewhere:

 (a) employed manipulative devices, schemes or artifices to defraud;

 (b) made untrue statements of material facts and omitted to state material facts necessary to make the statements made, in the light

of the circumstances under which they were made, not misleading; and

 (c) engaged in acts, practices and a course of business which operated or would operate as a fraud or deceit upon Plaintiff and the Class he represents.

7. While plaintiffs' complaints do not specifically state that they relied on the integrity of the market, their papers in support of the motion for class certification do assert that "[t]he deposition testimony of both Ms. Gibb and Mr. Krumbein reflects that they both rely very heavily upon the integrity of the market place for securities in buying and selling stock" (Plaintiffs' Reply to Defendants' Memorandum in Opposition to Motions for Class Certification at 3).

defraud the public. Because plaintiffs have failed to discuss such a scheme in any factual detail, in either the complaints or the papers supporting plaintiffs' motion, plaintiffs have failed to plead a fraud on the market.

Perhaps the most important allegation missing from plaintiff's claim of a scheme is that the stocks would never have been issued or marketed without the fraud. *See, e.g., Shores*, 647 F.2d at 470:

> If Bishop proves no more than that the bonds would have been offered at a lower price or a higher rate, rather than that would have never been issued or marketed, he cannot recover.

The scheme alleged in *Shores* exemplifies the type of fraudulent conduct that must be asserted. There it consisted of multiple acts of misrepresentation and omission by most of the important participants in, and at virtually every important stage of, the issuance of the securities in question: by bond counsel, the lessee of the industrial business premises involved ("the user"), two different underwriters, the trustee of the bond proceeds, a certified public accountant and the construction company which was to construct part of the facilities contemplated by the bond issue. *See Shores*, 647 F.2d at 465–67, for a recitation of the various misrepresentations involved.

What *Shores* teaches is that mere allegation of a "scheme" is not enough to state a fraud on the market. Even the simplest and most garden variety securities fraud case could be characterized as a "scheme," as that term is commonly used.[8] To accept allegations of a scheme substantially less extensive or pervasive than that in *Shores* would, for all practical purposes, eliminate entirely the well-established body of law

requiring proof of reliance in all Section 10 and Rule 10b–5 cases.

### B. Section 11 of the Securities Act of 1933

The defendants maintain that Krumbein cannot represent a class of claimants under Section 11 of the Securities Act of 1933 because he was not a direct purchaser of Delta stock. In support of this proposition, they rely primarily on *Barnes v. Osofsky*, 373 F.2d 269 (2d Cir.1967).

The district court in *Barnes* was confronted with an objection to a settlement agreement disposing of several securities claims, which had already been approved by the court and upon which judgment had been entered. The objection to the settlement

> went to the provision limiting the benefits of the settlement to persons who could establish that they purchased securities issued under the 1963 registration statement, which thus eliminated those who purchased after the issuance of the allegedly incomplete prospectus but could not so trace their purchases.

*Id.*, at 271. The district court ruled against those objecting to the settlement and held that Section 11 extended only to purchasers of newly registered shares.

On appeal, the Second Circuit was required to determine the reach of Section 11 by construing the phrase "any person acquiring such security."[9] The court recognized that it could be given a narrow or broad reading. Read narrowly, Section 11 would be confined to a person " 'acquiring a security issued pursuant to the registration statement;' " read broadly, it would extend to the person " 'acquiring a security of the same nature as that issued pursuant to the registration statement.' " *Id.* In the end, the court gave the provision the

---

**8.** A "scheme" is defined as a "design or plan formed to accomplish some purpose—a system." BLACK'S LAW DICTIONARY 1511 (rev. 4th ed. 1968).

**9.** Section 11(a) provides that: "In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material

fact required to be stated therein or necessary to make the statements therein not misleading, *any person acquiring such security* (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue ...") (emphasis added). 15 U.S.C. § 77k(a).

narrower interpretation, thus limiting Section 11 to purchasers of registered shares.

Contrary to the position asserted by defendants here, however, the court did not limit recovery to direct purchasers, i.e., immediate purchasers from the party or parties sought to be held liable. *See Kramer v. Scientific Control Corp.*, 365 F.Supp. 780, 789–90 (E.D.Penn.1973) ("Section 11 of the 1933 Act does not require that the securities be acquired from the original offering"). In fact, the *Barnes* court allowed recovery by other than direct purchasers, as long as their shares could be traced back to the registration statement.

■ To recover under Section 11 a party need only show that he purchased securities that are the direct subject of the prospectus and registration statement. *See Unicorn Field, Inc. v. Cannon Group, Incorporated*, 60 F.R.D. 217, 226 (S.D.N.Y. 1973) ("it is now well settled in this Circuit that § 11 of the Securities Act ... permits recovery only by purchasers of the *shares covered by the defective registration statement* or by those who can *trace their purchases directly to such shares*") (emphasis added); *Wolfson v. Solomon*, 54 F.R.D. 584, 588 (S.D.N.Y.1972) ("it is now clear that only persons who purchased securities that are the *direct subject of the prospectus and registration statement* may sue under Section 11") (emphasis added).[10]

■ Thus, the court concludes that Section 11 does not prevent Krumbein from representing a class asserting claims under that statute.

**10.** In view of the decision not to certify a class under Rule 10b–5, it is unnecessary to consider defendants' argument that a representative of a Section 11 class cannot also represent a Rule 10–b class.

**11.** Section 12(2) provides in pertinent part that "Any person who offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact ... shall be *liable to the person purchasing such security*

## C. Section 12(2) of the Securities Act of 1933

■ Plaintiffs maintain that defendants are liable under Section 12(2) of the Securities Act of 1933 [11] because of false and fraudulent statements which induced plaintiffs to purchase Delta stock. A purchaser proceeding under Section 12(2) must show, in addition to the jurisdictional use of an instrumentality of interstate commerce, the violation of Section 12(2)'s antifraud provisions by a "seller." The issue at this point, and the basis for the defendants' only objection to certification of this claim, is whether the defendants are "sellers" as that term is used in Section 12. *Pharo v. Smith*, 621 F.2d 656, 667 (5th Cir.1980), articulated the test for determining who is or is not a "seller:"

We read *Hill York* and *Lewis* as limiting sections 12(1) and (2) sellers (i) to those in privity with the purchaser and (ii) to those whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place. Mere participation in the events leading up to the transaction is not enough.

*See also Junker v. Crory*, 650 F.2d 1349, 1360 (5th Cir.1981).

■ While the court cannot say, at this point, that this issue will not require *any* individual proof, the necessity for extensive individual proof by members of the class on this issue appears highly unlikely.[12] The first prong of the *Pharo* test—the privity prong—may require individual proof, but should be easily handled by stipulation one way or the other as to each member of the class. Since proof relating to the second prong will necessarily concentrate on the *defendants'* individual relationship *to the*

*from him ...*" (emphasis added). 15 U.S.C. § 77*l*(2).

**12.** On this issue, plaintiffs state: "Clearly Delta as the issuer on the public offering was a 'substantial factor' in causing Mr. Krumbein's purchase to occur, since there would have been no stock to purchase but for the public offering" (Plaintiffs' Reply to Defendants' Memorandum in Opposition to Motions for Class Certification at 70). This allegation is not, at this stage, disputed by defendants.

*transaction,* rather than on the relationship of each member of the class to the transaction, if the necessary relationship between defendants and the transaction can be established as to one member of the class, it is also established as to all.

### D. Miscellaneous Statutory Provisions and the Common Law

Plaintiffs also maintain that the alleged misrepresentations are actionable under both statutory and common law of Texas, as well as sections of the federal criminal code. From the court's reading of the papers in this case, as well as from the oral argument of the parties, it appears that plaintiffs are not actively pursuing class certification of these claims.

 In their Reply to Defendants' Memorandum in Opposition to Motions for Class Certification, plaintiffs seem to put their main emphasis on Sections 11 and 12.

> Defendants have striven mightily to confuse the issues before the court by mixing indiscriminately the objections to class certification under Section 10 .... Unfortunately for Defendants, remedies under Section 10 and Rule 10b–5 are of only subsidiary importance in this case *as compared to remedies under Sections 11 and 12,* so that when the objections raised by Defendants to class certification under Section 10 and Rule 10b–5 are dispensed with, Defendants are *left with practically no objections of consequence to certification under Sections 11 and 12.*

(emphasis added).

Because the plaintiffs have given *significantly* less attention to the claims based on these miscellaneous statutes and the common law than that given to the claims previously discussed, the court infers that plaintiffs would concede that class certification of these claims is inappropriate. Even if the court is incorrect in this inference, however, plaintiffs' failure to discuss, let alone establish by a preponderance of the evidence, the requirements of Rule 23 in relation to each of these miscellaneous statutes and the common law leads the court to the same conclusion—that a class cannot be certified as to claims based on the miscellaneous statutes and the common law.

### IV. Rule 23(a)

 The utility of the class action to cases involving the securities laws has been repeatedly recognized. The securities laws are complex; actions under them are expensive. Without a class action, many actionable wrongs would go uncorrected and unrecompensed. In essence, the class action is a *bona fide* method for redressing violations of the securities laws and for compelling compliance with their mandates. *Green v. Wolf Corporation,* 406 F.2d 291, 295–96 (2d Cir.1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). As stated by the district court in *Hawk Industries, Inc. v. Bausch & Lomb, Inc.,* 59 F.R.D. 619, 624–25 (S.D.N.Y.1973):

> [A] class action is the best method for determination of the substantive issues. Litigation of this sort is commonly determined by means of a class action ... [citations omitted]. Plaintiffs claim that the damages are approximately $20.00 per share. Plainly, many small investors, purchasers of 100 or 200 shares, while clearly not without means, have not suffered sufficient damages to warrant an individual action. Those purchasers will have no viable recourse if this motion is denied.

For this reason, in a doubtful case any error should be committed in favor of allowing the securities class action. *Horton v. Goose Creek Independent School District,* 690 F.2d 470, 487 (5th Cir.1982), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983).

On a motion for class certification, the plaintiffs have the burden of proof, *Fleming v. Travenol Laboratories, Inc.,* 707 F.2d 829, 832 (5th Cir.1983), and must establish all of the following requirements of Rule 23(a):

(1) That the class is so numerous that joinder of all members is impracticable;

(2) That there are questions of law or fact common to the class;

(3) That the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) That the representative parties will fairly and adequately protect the interests of the class.

■ If any of these requirements is not met, the court must refuse to certify the class. *Huff v. N.D. Cass Co.*, 485 F.2d 710, 712 (5th Cir.1973) (*en banc*). The first two prerequisites of Rule 23(a), numerosity and commonality, focus on characteristics of the class, while the second two prerequisites, typicality and adequacy of representation, focus on the class representative. *Edmondson v. Simon*, 86 F.R.D. 375, 380 (N.D.Ill.1980). In addition, the plaintiffs must establish that the action fits within one of the categories described in Rule 23(b).[13] *Redditt v. Mississippi Extended Care Centers, Inc.*, 718 F.2d 1381, 1387 (5th Cir.1983).

■ In determining the propriety of a class action, the question is not whether the plaintiffs have stated a cause of action or will prevail on the merits but solely whether the requirements of Rule 23 have been met. *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974); *Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981). While the court may not allow its view of the merits to determine the outcome of the class certification issue, *Johnson v. American Credit Co. of Georgia*, 581 F.2d 526, 532 (5th Cir.1978), class determination necessarily involves considerations enmeshed in the factual issues comprising the plaintiffs' causes of action. Sometimes the issues are plain enough from the pleadings, though at other times it may be necessary for the court to probe behind the pleadings. *General Telephone Company of the Southwest v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982).

Here, briefs on class certification filed by both parties are replete with factual references to issues going outside the requirements of Rule 23. One such issue is reliance. Given the court's decision to deny certification of a class on plaintiffs' 10b–5 claim, this issue has little relevance to certification *vel non* of the claims under Sections 11 and 12.

■ Though defendants' main objection to certification of a class in this case focuses on the fourth requirement of Rule 23(a)—the adequacy of the proposed class representatives to represent the interests of the class—the court will also review the other criteria of Rule 23 to assure that they have been met.

## A. Numerosity

While plaintiffs are not able to state with precision the exact size of the potential class,[14] they do state that, according to the Form 10–K Delta filed with the SEC for the fiscal year ending December 31, 1981, there were 2,800 holders of record of Delta's common stock and 21,715,543 shares of Delta common stock outstanding. Plaintiffs further state that approximately 4,000,000 shares of common stock were issued and sold under the prospectus in question. Based on these figures, plaintiffs estimate the class to be between 2,000 and 6,000 persons. Defendants do not challenge these figures or plaintiffs' estimate of the class size.[15]

---

**13.** Though technically only the requirements of section (a) of Rule 23 are "prerequisites" to a class action, the Fifth Circuit has also treated qualification for a Rule 23(b) category as a prerequisite to class actions. *Horton v. Goose Creek Ind. School Dist.*, 690 F.2d 470, 484 n. 25 (5th Cir.1982).

**14.** Failure to state the exact number in the proposed class does not defeat a motion for class certification so long as the proposed class is not amorphous. *Siegel v. Realty Equities Corporation of New York*, 54 F.R.D. 420, 424 (S.D.N.Y. 1972).

**15.** Defendants do challenge whether the 87 employees of Delta who received their stock under the exchange offer satisfy the numerosity requirement. Given the court's refusal to certify a class including these 87 individuals, see discus-

The estimated class size of at least 2,000 persons satisfies the numerosity requirement of Rule 23. *See Boykin v. Georgia-Pacific Corporation*, 706 F.2d 1384, 1386 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 999, 79 L.Ed.2d 231 (1984) (class of 317 individuals sufficient); *Bradford v. Sears, Roebuck and Co.*, 673 F.2d 792, 795 (5th Cir.1982) (class of 700 individuals sufficient); *Kleiner v. First National Bank of Atlanta*, 97 F.R.D. 683, 691 (N.D.Ga.1983) (class of "more than 2,000" sufficient); *In re Alcoholic Beverages Litigation*, 95 F.R.D. 321, 324 (E.D.N.Y.1982) (class of "more than 2,000" sufficient).

B. Common Questions of Law or Fact

 Under Rule 23(a)(2), plaintiffs may bring a class action only if there are questions of law or fact common to the class. While this provision does not require complete identity of legal claims among the class members, it does require that there be at least one issue whose resolution will affect all or a significant number of the putative class members. *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir.1982).

 One test of commonality is whether the claims of plaintiffs and the claims of the putative class are grounded in the same legal theory and the same practices. *Donaldson v. Pillsbury Company*, 554 F.2d 825, 831 (8th Cir.), *cert. denied,* 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977); *Penk v. Oregon State Board of Higher Education*, 93 F.R.D. 45, 49 (D.Ore.1981). *See also Gonzales v. Cassidy*, 474 F.2d 67, 71 n. 7 (5th Cir.1973) (what is required is that the claims be based upon the same legal or remedial theory). Another test of commonality is whether common or individual questions will be the object of most of the efforts of the litigants and the court. *Republic National Bank of Dallas v. Denton & Anderson Co.*, 68 F.R.D. 208, 215 (N.D.Tex.1975).

It is very clear that the focus of this suit will be the three alleged misrepresentations and omissions contained in the stock offering prospectus.[16] Here, the class members are bound together by the nature and materiality of the claimed omissions from, and the contents of, the three allegedly misleading statements. If the proposed class representatives prove their case with respect to the prospectus in question, they will also have provided all the proof required on the issue of misrepresentation for every other member of the class who purchased pursuant to the prospectus. *See Green v. Wolf Corporation*, 406 F.2d 291, 300 (2d Cir. 1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); *Korn v. Franchard Corporation*, 456 F.2d 1206, 1210 (2d Cir.1972) ("This pre-condition [Rule 23(a)(2)'s common questions of law or fact] is plainly satisfied since the alleged misrepresentations in the prospectus relate to all the investors, and the existence and materiality of such misrepresentations obviously present important common issues").

Other cases reach the same result. *See Kleiner*, 97 F.R.D. at 692 ("In this case, putative class members signed *identical* or similar form agreements, all of which present the question of the meaning of such terms as 'prime rate,' 'best and most creditworthy commercial borrowers,' 'per annum,' and '360-day year simple interest basis.' The meaning of these terms is the predominant issue in the case and is an issue common to all class members") (emphasis added); *Feder v. Harrington*, 52 F.R.D. 178, 181 (S.D.N.Y.1970) ("Since each class member tendered … pursuant to the *identical writing*, questions of fact are common to all members who tendered their shares. Questions of law are also common to class members, namely whether the acts complained of constituted a violation of the Securities Exchange Act") (emphasis added). *Cf. Simon v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 482 F.2d 880, 883 (5th Cir.1973) ("Even if plaintiff had established that the alleged misrepresentations

---

sion *infra* at pp. 80–82, this objection to numerosity need not be decided.

**16.** As discussed later, certification of a class including Delta employees who acquired their stock pursuant to the exchange offer prospectus is denied.

were primarily written, a class action would not be appropriate unless he could prove the *similarity* of the writings") (emphasis added).

For example, a case under Section 11 requires proof of very few elements, all of which are common to the class. With certain exceptions not applicable here, plaintiffs need only demonstrate that the registration statement and prospectus were materially false and misleading and need not prove fraudulent intent on the part of the issuer. *Unicorn Field,* 60 F.R.D. at 227.

Section 11 was designed to assure compliance with the disclosure provisions of the Exchange Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering. If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case. Liability against the issuer of the security under Section 11 is then virtually absolute. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983).

#### C. Typicality

Rule 23(a)(3) requires a showing that "the claims ... of the representative parties are typical of the claims ... of the class." It is difficult to ascertain how the typicality requirement differs from either Rule 23(a)(2) or Rule 23(a)(4), at least as those two sections have been developed by case law. Many courts and legal scholars have noted that the typicality requirement overlaps with other subsections of Rule 23(a). *See, e.g., Robertson v. National Basketball Association,* 389 F.Supp. 867, 898 (S.D.N.Y.1975) ("[T]he requirements of these two subsections [Rule 23(a)(3) and 23(a)(4)] are virtually the same"); 7 C. Wright and A. Miller, *Federal Practice and Procedure,* § 1764 (Supp.1983) ("When the claims of the representatives and the class members stem from a single event, the standard under subdivision (a)(3) is closely related to the test for the common question prerequisite in subdivision (a)(2)"): 3B Moore, *Federal Practice,* ¶ 23.06–2 (2d

Ed.1972) ("[T]here is no need for [Rule 23(a)(3)], since all meanings attributable to it duplicate requirements prescribed by other provisions in Rule 23").

It appears to this court that Rule 23(a)(3) must have been intended to have *some* meaning independent of the other requirements of Rule 23. *See Taylor v. Safeway Stores, Incorporated,* 524 F.2d 263, 269–70 (10th Cir.1975). This part of Rule 23 requires that at least the following test be met:

> A class representative must be part of the class and possess the same interest and suffer the same injury as class members.

*General Telephone Company of the Southwest v. Falcon,* 102 S.Ct. at 2370; *Everitt v. City of Marshall,* 703 F.2d 207, 210 (5th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 241, 78 L.Ed.2d 231 (1983).

The requirement that the proposed class representatives' claims be typical of the claims of the class does not mean, however, that all claims must be identical. *Phillips v. Joint Legislative Committee, Etc.,* 637 F.2d 1014, 1024 (5th Cir.1981), *cert. denied,* 456 U.S. 960, 971, 102 S.Ct. 2035, 2233, 72 L.Ed.2d 483, 845 (1982).

Both *Gibb* and *Krumbein* satisfy this test of typicality. The claims of Krumbein and Gibb cannot be but typical of the class claims for they are, except as to the amount of damages claimed, identical to those of other class members. *See Hernandez v. United Fire Insurance Company,* 79 F.R.D. 419, 425 (N.D.Ill.1978). Differences in the amount of damages sought do not destroy typicality. *Blackie,* 524 F.2d at 905.

Defendants' other objections on the ground of typicality, whether under that label or not, overlap with objections to adequacy of representation and, to avoid duplication, will be examined under that heading.

#### D. Adequacy of Representation

Rule 23(a)(4) requires a finding that "the representative parties will fairly and adequately protect the interests of the

class." While a number of varying factors have been considered by courts under the heading of adequacy, it appears that adequate representation generally consists of two primary elements:

(1) It must appear that the representative parties, through their attorneys, will vigorously prosecute the class claims, and

(2) There must be an absence of conflict or antagonism between the interests of the named plaintiffs (in the subject matter of the litigation) and those of other members of the proposed class.

*Quigley v. Braniff Airways, Inc.,* 85 F.R.D. 74, 84 (N.D.Tex.1979); *Hernandez,* 79 F.R.D. at 425–28.

While Rule 23(a)(4) does not require that the case be prosecuted by the "best" plaintiff in the putative class, it does require the representative to be one who will adequately protect the interests of the class. The determination that a party would adequately protect the interests of the class is a question of fact that depends on the circumstances of each case. *McGowan v. Faulkner Concrete Pipe Company,* 659 F.2d 554, 559 (5th Cir.1981).

### 1. Vigorous Prosecution

The first element of the adequacy requirement mandates an inquiry into the zeal and competence of the representatives' counsel and into the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees. *Horton,* 690 F.2d at 484.

It is significant here that defendants have not challenged the competence of counsel for the proposed class. Indeed, the record indicates that counsel are experienced and capable in handling class actions similar to the present case. This is relevant because inquiries into the professional competence of their counsel inevitably merge into the broader issue of whether the representatives and their counsel *together* will sufficiently serve the interests of absent class members. *Hernandez,* 79 F.R.D. at 428.

While, generally speaking, consideration of the adequacy requirement tends to focus primarily on the competence and experience of class counsel, Rule 23(a)(4) does warrant some inquiry into the personal characteristics of the proposed representatives as well. *Id.,* at 425.

#### a. Plaintiff Courtney Gibb

As to Gibb, the defendants maintain that she is an inadequate representative of the class for the following four reasons:

(1) Incredibility;

(2) Lack of diligence;

(3) Lack of interest; and

(4) Heavy reliance on counsel.

The basis for defendants' challenge to Gibb's credibility is summarized by the following excerpts from defendants' Memorandum Opposing Class Certification.

Discovery from plaintiff Courtney Gibb has produced inconsistencies and contradictions that totally undermine her credibility . . . . This confusion begins with claims of plaintiff Gibb that she lost the original prospectus, then found it, then lost it again.

\* \* \* \* \* \*

Plaintiff Gibb's testimony that she relied upon a final prospectus for Delta stock before placing her order could not be correct; distribution of the final prospectus had not even begun on the day she placed her order.

(Memorandum in Opposition to Motions for Class Certification at 3, 6).

Defendants rely primarily on *Panzirer v. Wolf,* 663 F.2d 365 (2d Cir.1981), *vacated as moot and remanded with instructions to dismiss with prejudice,* 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982), to support their position that these "inconsistencies" and "impossibilities" render Gibb inadequate to represent the class. There the district court ruled that Panzirer's lack of credibility made her an inadequate representative under Fed.R.Civ.P. 23(a)(4). The Second Circuit Court of Appeals affirmed the district court's denial of class certification on that ground. The Second

Circuit recited the following facts in support of the district court's denial.

> Plaintiff's lack of credibility is abundantly clear in the record. She gave *no less than four versions* of her conversations with her broker. At her deposition, she described the conversation as containing no specific information about Allied. Before signing her deposition, she changed her story to say that Michael Blum had read unspecified information to her from his Standard & Poor's tear sheet. In her affidavit explaining her changes in testimony, she alleged that he had told her that Allied had made money in 1978. After defendants introduced an affidavit from the broker that he had never looked at the financial information on Allied in the tear sheet, Zelda Panzirer introduced a final affidavit alleging that he had read financial information to her from the tear sheet.

(emphasis added). 663 F.2d at 368.

While defendants are correct in contending that the court may, in its discretion, consider the credibility of the proposed class representative, that rule does not mandate denial of class certification in this case. Since the number and extent of "inconsistencies" in *Panzirer* significantly exceed those presented here, the facts of the two cases are not comparable. Additionally, plaintiffs have offered what appears, at this point, to be a reasonable explanation for the discrepancies in Gibb's testimony.

■ Moreover, the only issue on which Gibb is alleged to be incredible deals with her *reliance* on the defendants' prospectus.[17] Since the court is certifying a class only under Sections 11 and 12, under which reliance is not an issue, any incredibility or inconsistency on the issue of reliance is irrelevant to the question of Gibb's adequacy as a class representative. In short, the court concludes that any discrepancy in the deposition testimony of Gibb is either irrelevant or insignificant; consequently, it has no bearing on the adequacy requirement of Rule 23(a)(4).

The second challenge to Gibb as a representative is the argument that she has not prosecuted this case with the requisite diligence. The specific complaint is that Gibb failed to file a motion for class certification within the time limits imposed by Local Rule of Practice 10.2(b) which provides:

> [w]ithin 90 days of the filing of a complaint alleging a class action, *the attorney* for the plaintiff shall move for certification [emphasis added].

As earlier stated, Gibb's motion was filed 15 days beyond this deadline. While defendants are again correct that the court may consider this delay, there is no rule which renders such delay inevitably fatal to class certification. *See McGowan*, 659 F.2d at 559 n. 3 ("While the employees did not comply with Local Rule 18 of the United States District Court for the Southern District of Mississippi requiring a plaintiff to file a motion for class certification within 45 days after the answer is filed, a technical violation alone may not be sufficient to require denial of certification"). The local rule imposes the obligation to timely file the motion on Gibb's attorney. As noted earlier, however, defendants have not challenged the competence of Gibb's counsel.

■ In this context, the two facets of the adequacy requirement—adequacy of counsel and the adequacy of the individual plaintiff—merge and become inseparable. In view of the fact that the motion for class certification has been diligently prosecuted *since* it was filed, and in the absence of any suggestion by defendants of other incidents wherein Gibb and her attorney have failed to diligently prosecute this case, *cf. McGowan*, 659 F.2d at 558–60, the court concludes that Gibb's untimely filing of her class certification motion is not a sufficient ground to deny class certification. *See Feder*, 52 F.R.D. at 181–82 (delay in filing motion for class certification not grounds for denial).

---

**17.** Defendants have not suggested that the bulk, or even a large portion, of Gibb's testimony is incredible. *Cf. Cohen v. Laiti,* 98 F.R.D. 581, 583–84 (E.D.N.Y.1983).

Defendants' third attack on Gibb's adequacy as a class representative is her alleged lack of a real interest—financial or otherwise— in this lawsuit. Defendants assert this lack of interest as follows:

Repeated efforts to schedule plaintiff Gibb's deposition were met with the argument that she was simply too busy .... Plaintiff Gibb's monetary stake in the case is consistent with her demonstrated attitude. Plaintiff Gibb lost only $75 (plus commissions) ....

(Memorandum in Opposition to Motions for Class Certification at 9).

In evaluating the adequacy of Gibb as class representative, it must be remembered that the court is not required to find the "best" representative, *i.e.*, the most vigorous or the most interested, but only one who will assert and protect the interests of the class. Gibb's protestation that she is "too busy" is not an uncommon response from a party discussing the prospects of having her deposition taken; nor is it uncommon for a party, even the most interested, to have problems in the scheduling of a deposition.

The court is unpersuaded by defendants' complaint that Gibb did not lose enough money to be interested in the lawsuit. This argument could be waged against virtually all proposed class representatives, particularly those in cases asserting securities claims. As earlier discussed, the class action device was designed to reach situations such as the one here—where the loss of all the members of the class on an individual basis is small—and a court is to err in favor of allowing a class action in securities cases where the individual loss is insignificant.

The last of defendants' challenges to Gibb's adequacy is that she is too dependent on her counsel. The only specific complaint in this regard is that:

When pressed on her personal involvement in responding to the discovery request, she replied "My counsel has taken care of that."

\*　　\*　　\*　　\*　　\*　　\*

Further, plaintiff Gibb demonstrated a great reliance on counsel at her deposition, suggesting that she lacks the necessary dedication to represent a class "fairly and adequately."

(Memorandum in Opposition to Motions for Class Certification at 9, 36).

It has been stated, though in a context not entirely applicable to the present case, that a proposed class representative should possess roughly that understanding of the facts which could reasonably be expected of an individual in her position with relation to the events in issue. *Hernandez*, 79 F.R.D. at 427. Above this threshold, however, it is not uncommon for an individual to leave preparation of discovery responses to her counsel or to rely heavily on counsel during deposition. *Cf. Efros v. Nationwide Corporation*, 98 F.R.D. 703, 708 (S.D. Ohio 1983). The court has been directed to no authority and can discern no rationale which would require a higher standard of involvement from a proposed class representative than from an individual plaintiff.

b. Plaintiff Herbert A. Krumbein

In regard to Krumbein, the defendants challenge his adequacy as a representative on the following grounds:

(1) His sophistication; and

(2) His motivation in bringing suit.

Defendants' first objection to Krumbein is that he is more sophisticated than other members of the class because, in their words,

Plaintiff Krumbein is a stockbroker and investment banker who admittedly based his decision to purchase Delta stock on its lines of business and its price—earnings ratio. His claim is thus not typical of other open-market purchasers ....

(Memorandum in Opposition to Motions for Class Certification at 24).

All of the authorities cited by defendants for the proposition that Krumbein is an inadequate representative because of his sophistication concern primarily the issue

of reliance in a suit under 10b–5.[18] Nevertheless, one of defendants' authorities concedes that even in a 10b–5 case, where reliance *is* an issue, the sophistication of the investor does *not necessarily* bar his representation of a class. *See Garonzik v. Shearson Hayden Stone, Inc.*, 574 F.2d 1220, 1221 (5th Cir.1978) (citations omitted), *cert. denied*, 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 39 (1979):

> [T]his characteristic [plaintiff's sophistication as an investor] may or may not eventually affect plaintiff's cause of action, ... and it might have prevented class certification if the district judge was so inclined ....

 Because the court has decided to certify a class solely on the claims under Sections 11 and 12, Krumbein's sophistication will not prevent him from acting as a class representative. Defendants' position regarding Krumbein's sophistication would preclude effective use of the class action in most securities fraud cases, since this characteristic (the varying expertise of class members) is common to stockholders in all public corporations.

If the plaintiffs are correct in their claim that the defendants omitted to state or affirmatively misstated material facts, the omitted or true information was no more available to brokers and large investment institutions than it was to small investors. All investors would have been misled by the same operative facts. *Feder*, 52 F.R.D. at 184. Stated another way,

> Where an investor is sophisticated ... he would have his sophistication thrown up as a defense to his claims as to the interpretation of financial statements.

But it makes no difference if you are the most or least knowledgeable investor in the market if facts are omitted or misrepresented in financial statements. It is impossible to arrive at a sound decision whether or not to invest if material facts are omitted or misrepresented.

*Rifkin v. Crow*, 80 F.R.D. 285, 286 (N.D. Tex.1978).

Defendants' second objection to Krumbein concerns his motivation for bringing this suit. Defendants assert that Krumbein brought this suit in an attempt to prevent Gibb from suing him because he sold her the Delta stock in question:

> Testimony of plaintiff Krumbein showed that he was initially concerned that his customer, plaintiff Gibb, might be suing him. From this testimony and the tenor of his deposition, the court could find that his primary motivation in joining the suit was to protect against this risk.

(Memorandum in Opposition to Motions for Class Certification at 12).

Little in the record lends support to this theory, and the court declines to adopt it. Krumbein was not named as a defendant in Gibb's complaint, which had been on file for over three months before Krumbein's complaint was filed. Filing of the Krumbein suit, of course, does nothing to prevent Gibb from suing Krumbein.

### 2. Absence of Conflict

The second element of the adequacy requirement deals with the absence of antagonism or conflict between the proposed class representatives and other members of the class.[19] The issue of antagonism is

---

**18.** *Garonzik v. Shearson Hayden Stone, Inc.*, 574 F.2d 1220 (5th Cir.1978), *cert. denied*, 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 39 (1979) ("This is an appeal from a denial of class certification in a case alleging 10(b)(5) security fraud ...."); *J.H. Cohn & Co. v. American Appraisal Associates, Inc.*, 628 F.2d 994, 996 (7th Cir.1980) ("The complaint charged that this conduct by the defendants was in violation of Sections 10(b), 18(a) and 20 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78r(a), 78t (1976); rule 10b–5 promulgated pursuant to Section 10(b), 17 C.F.R. § 240.10b–5; and common law fraud"); *Lewis v. Johnson*, 92 F.R.D. 758 (E.D.N.

Y.1981); *Model Associates, Inc. v. U.S. Steel Corporation*, 88 F.R.D. 338, 339 (S.D.Ohio 1980) ("In its amended complaint plaintiffs assert a cause of action against defendant pursuant to Section 10(b) of the Securities Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 ...").

**19.** Intra-class antagonism may be analyzed under either Rule 23(a)(4), the adequacy requirement, or Rule 23(a)(3), the typicality requirement. In this case, it will be analyzed under adequacy because, although each class member has the same type of claim asserted by the named plaintiffs, many members may neverthe-

grounded in the requirements of due process. The class action is an action taken in the name of absent parties who will be bound by it. Class members whose interests are in fact antagonistic to, or even potentially conflicting with, the interests of the ostensibly representative parties cannot be bound, consistent with the requirements of due process. *Phillips v. Klassen*, 502 F.2d 362, 366 (D.C.Cir.), *cert. denied*, 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974).

Defendants have suggested two areas of conflict between the proposed class representatives and other members of the class—one of little moment and another of significant consequence. The minor conflict is between members of the class who sold their stock and members of the class who still hold the shares they purchased pursuant to the registration statement and the prospectus. In relationship to this "conflict," the whole of defendants' argument is as follows:

> Plaintiffs do not propose to distinguish between current holders of Delta stock and former holders who, like plaintiffs Gibb and Krumbein, have now disposed of their ownership interest in Delta. A distinction must be drawn between current shareholders and former shareholders, however, because a damage award in favor of former shareholders would injure the investment of current shareholders. In *Wood v. Rex-Noreco, Inc.*, 61 F.R.D. 669, 674 (S.D.N.Y.1973), for example, the Court concluded that there were "substantial and conflicting interests" between current shareholders, who have a "substantial interest" in the defendant "remaining an ongoing enterprise," and "allegedly defrauded shareholders" who seek damages.

(Memorandum in Opposition to Motions for Class Certification at 27–28).

less not see it in their best interests to assert that claim. The real question then is whether, in spite of the typicality of their claims, the named plaintiffs can adequately represent the interests of the class, including any interest in *not* asserting the claims. *Horton v. Goose Creek Independent School Dist.*, 690 F.2d at 485 n. 27.

Perhaps the most thorough discussion of the authorities for and against defendants' proposition, including the *Wood* decision upon which defendants rely, is contained in *Schnorbach v. Fuqua*, 70 F.R.D. 424 (S.D. Ga.1975). After analyzing the cases addressing this issue, *Schnorbach* concluded that

> absent a "substantial" equity interest in the representative party, and absent a conflict over alternative remedies, the "conflict" between past and present shareholders is no bar to certification [and] the various courts that granted certification to classes consisting of past and present shareholders did so on a *prima facie* lack of apparent conflicts of interests within the class.

70 F.R.D. at 432–33.

This court concludes, based in part on *Schnorbach's* analysis of the relevant authorities and in part on its own analysis, that this factor should not bar class certification. Here, the liability issues are identical regardless of whether the class members presently hold Delta stock or not. Defendants have given no reason, supported by evidence, for this court to assume [20] that even current shareholders would not want liability imposed, if the facts warrant it. *See, e.g., Herbst v. International Telephone and Telegraph Corporation*, 495 F.2d 1308, 1314 (2d Cir.1974) ("the personal interest of those who still hold ITT stock in gaining more from the exchange than they did far outweighs their concern that any award could damage ITT"); *In re U.S. Financial Securities Litigation*, 64 F.R.D. 443, 452 (S.D.Cal.1974) (court rejected defendants' contention that Penn Mart Realty was an inadequate class representative because its 200 shares were purchased very near the end of the class period, allegedly giving it little interest in prosecuting class claims at the beginning of the relevant time

**20.** The court has seen no evidence tending to show that a judgment against defendants will have *any* impact on the financial viability of Delta or on the current value of its stock.

period with equal vigor); *Herbst v. Able*, 47 F.R.D. 11, 15 (S.D.N.Y.1969) ("practically every class action that can be brought ... involves claims both by those who retained their securities and those who sold them or by those who sold some securities, but still retain others. The answer to this problem ... is simply that every defrauded stockholder wears two hats, but that *his personal interest far overshadows* his interest as an equity holder") (emphasis added).

The second conflict of interest alleged by defendants to exist between the proposed class representatives and the other members of the class cannot be handled so summarily and, in fact, must be decided against plaintiffs. Defendants maintain that the interests of those who purchased stock pursuant to the stock offering, i.e., the public in general, conflict with the interests of the employees who acquired their stock pursuant to the exchange offering ("the employees").

■■■ Diverse and potentially conflicting interests within the class are incompatible with maintenance of a class action. Conflicts of interest, especially antagonistic or divergent claims, preclude formulation of relief which will benefit all members of the class. A lack of congruence among the interests of the class representative and class members may render counsel for the class, despite their qualifications, unable to fully and fairly counsel the named plaintiffs and class members, to each of whom they owe a duty. A plaintiff whose interests conflict with those of certain class members limits his attorneys' ability to counsel the class and is, therefore, an inadequate representative. *Quigley v. Braniff Airways, Inc.*, 85 F.R.D. at 84. A court must decline to entertain a suit as a class action if it discerns that the interests of the proposed class representatives are in significant part antagonistic to those of the class they purport to represent.

Courts have found genuine conflicts of interest that fall into the following categories:

(1) when the proposed class representative is seeking a form of relief different from what the rest of the proposed class would want;

(2) when the proposed class representative has instituted both a derivative suit on behalf of the corporation and its existing shareholders and a class action against the corporation on behalf of former shareholders; or

(3) when the proposed class representative holds a substantial equity interest in the defendant-corporation which may militate against his seeking the imposition of damages against the corporation.

*Madonick v. Denison Mines Limited*, 63 F.R.D. 657, 659 (S.D.N.Y.1974).

■■■ Although this case does not fit neatly within any of these categories, the type of conflict embodied in the first category above prevents certification of a class which includes Delta employees who received their stock pursuant to the exchange offer. Those employees are in a situation quite different from those individuals who purchased pursuant to the Stock Offering Prospectus. This different situation is not so much due to events that transpired before or at the time of exchange offering[21] but to their long-term relationship with Delta. While the court has been referred to no evidence from which it can be determined how many of these individuals are still in Delta's employ or are currently receiving some benefit from Delta, there is evidence that the only employees who were eligible for participation in the exchange offering had at least 15 years of service. Given this longstanding relationship, and the evident loyalty of many Delta employees, the interests of these persons would appear to be adverse either to the other class members (i.e., purchasers in the pub-

---

21. For example, defendants argue that the employees possessed more information on Delta than was provided to the public in the prospec-tus and, therefore, cannot be said to have relied on the alleged misrepresentations in the prospectus.

lic offering) or to Delta, their employer (past or present).

In that regard, the case of *Phillips v. Klassen*, 502 F.2d 362, is analogous. In *Phillips*, the class sought to be certified was former employees of the United States Post Office Department who accepted offers to resign, with retirement benefits and a special bonus equal to six months pay, rather than face the prospect of separation from the Department as part of a reduction in force. At that time, a federal employee was normally entitled to retire with an annuity only if he was 55 years of age with 30 years of service, or 60 years of age with 20 years of service, or 62 years of age with five years of service. After completing 25 years of service or after becoming 50 years of age and completing 20 years of service, an employee involuntarily separated from the service was entitled only to a reduced annuity. According to Civil Service Commission interpretations, a resignation submitted in contemplation of a reduction in force constituted an involuntary resignation.

To encourage a reduction in force, pursuant to plans for a reorganization, the Post Office offered the special bonus to those employees who retired between May 16 and June 15, 1971. By June 15, 1971, 1,884 of the 2,740 postal employees eligible for the bonus retired under the involuntary resignation provisions. Included in this group were the five named plaintiffs who alleged that they, and a class of more than 1500, were coerced into premature retirement.

In determining whether the named plaintiffs would adequately represent the interests of the class as a whole, the court recited the general rule that:

> ... unless the relief sought by the particular plaintiffs who bring the suit can be thought to be *what would be desired by the other members of the class*, it would be inequitable to recognize plaintiffs as representative ....

(emphasis added). 502 F.2d at 366.

The court then stated that the challenged actions of the Post Office were probably received quite differently by different employees.

> In all likelihood, some were employees who understood full well that they were to be separated due to the impending reduction in force, and were affirmatively pleased to have the opportunity to resign with retirement benefits and a substantial bonus .... There may have been others who did not know for a fact how they would be affected by the reduction in force, but were sufficiently aware of their relative seniority and their evaluation by their superiors to make a relatively informed estimate. To them as well, the offer was probably perceived as an enlightened and humane way for the Department to trim its employment rolls. Doubtless there are a substantial number who perceived the situation in the same way as the plaintiffs in this action: the effect of the reduction in force was unknown, and the benefits offered were too sweet to turn away on a gamble of retention.

502 F.2d at 366–67.

The court concluded that, because the allegedly invalid action could be construed as conferring economic benefits *or* working economic harm, *depending on the circumstances of the individuals,* the named plaintiffs could not adequately represent the interests of the entire class sought to be certified.

As in *Phillips*, the employees here are likely to view this action in different ways than will other members of the proposed class. The relationship that the Delta employees now have or have had in the past with their employer makes it questionable whether they would desire the same result, or view the transactions in question with the same perspective, as outsiders whose only relationship to Delta was their purchase of shares. To some employees at least, the relationship that they have had with Delta may be more important than whatever monetary loss they may have sustained. Consequently, the possible antagonism between the interests of the proposed class representatives and the employ-

ees who acquired their Delta stock pursuant to the exchange offering prospectus renders Gibb and Krumbein inadequate to represent the interest of the employees.

*See generally Hansberry v. Lee*, 311 U.S. 32, 44–45, 61 S.Ct. 115, 119, 85 L.Ed. 22 (1940) ("It is one thing to say that some members of a class may represent other members in a litigation where the sole and common interest of the class in the litigation, is either to assert a common right or to challenge an asserted obligation ... [but] [i]t is quite another to hold that all those who are free alternatively either to assert rights or to challenge them are of a single class"); *Dierks v. Thompson*, 414 F.2d 453, 456 (1st Cir.1969) ("while the suing plaintiffs may have been of the opinion that wise management or other factors would cause the fund to grow, others could well have thought that a vested obligation in a fixed amount would be more desirable than to incur investment risks"); *Burns v. United States Postal Service*, 380 F.Supp. 623, 629 (S.D.N.Y.1974) ("it is probable that the vast majority of supervisors were actually pleased that the Postal Service gave them this additional compensation without deducting anything for retirement purposes"). *Cf. Koenig v. Smith*, 88 F.R.D. 604, 609 (E.D.N.Y.1980) ("defendants have not suggested that any class member is not interested in having liability established; nor have they suggested that any class member would be unwilling to have this plaintiff prove defendants committed fraud ...").

On these grounds, the court refuses to certify a class that includes the employees who acquired their shares of Delta stock pursuant to the exchange offer.

### V. Rule 23(b)(3)

Rules 23(b), Fed.R.Civ.P., provides that: An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \* \* \* \*

(3) the court finds that the questions of law or fact common to the members of

the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Under this part of the rule, the issues that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof. *Nichols v. Mobile Board of Realtors, Inc.*, 675 F.2d 671, 676 (5th Cir.1982).

The court's discussion of this "prerequisite" [22] need not be extended, for the issue here substantially overlaps with the commonality issue previously discussed. As the court has already stated, there are no issues other than damages, under either Section 11 or Section 12 requiring individual proof. Because the issues of liability under those sections focus exclusively on the actions or inactions of defendants, no proof other than generalized proof should be necessary.

The only argument made by defendants relating specifically to Rule 23(b)(3) is that a class action may not be a superior means for adjudication of this controversy because, without certification, only the individual suits of Gibb and Krumbein will need adjudication. The basis for defendants' position is their allegation that they have had no complaints from any other investor besides Gibb and Krumbein. For the reasons stated in *Siegel v. Realty Corporation of New York*, 54 F.R.D. 420, 426–27 (S.D.N.Y.1972), this argument is unpersuasive.

The fact that no one has sought to intervene in this action is of no consequence .... No one else may have been injured to such an extent to make it worthwhile for him to undertake the heavy financial burden of conducting ... [a securities] action. Moreover ... "their failure to come forward is as consistent with the view that they are sitting back, watching the action proceed, content with the job their representatives are doing, as it is

**22.** See note 13 above.

with the view that they disapprove of the action."

*See also Green v. Wolf Corporation*, 406 F.2d at 301, and *Herbst v. ITT*, 495 F.2d at 1314 (the fact that no other shareholders had sought to intervene is not relevant to the typicality of plaintiff's claims). In a situation such as the present case, it is clear that the requirement of Rule 23(b)(3) is met.

## VI. Conclusion

Having found the requirements of Rule 23(a) and (b)(3) satisfied as to some members of the proposed class, the court certifies the following class:

All persons other than the defendants and those in privity with them, who from March 12, 1981 to August 18, 1982, acquired shares of common stock of Delta Drilling Company, pursuant to a registration statement and prospectus dated March 17, 1981, and have either sold or retained such shares at a loss.

## VII. Notice

Counsel for plaintiffs are directed to submit within thirty days a proposed form of notice to the class, as contemplated by Rule 23(c)(2), Fed.R.Civ.P.